TENNESSEE ELECTRIC POWER CO. ET AL. *v.*
TENNESSEE VALLEY AUTHORITY ET AL.

No. 27. Argued November 14, 15, 1938.—Decided January 30, 1939.

---

[1] 97 F. 2d 22.

*Messrs. Raymond T. Jackson* and *John C. Weadock,* with whom *Messrs. Charles C. Trabue* and *Charles M. Seymour* were on the brief, for appellants.

120

122

*Messrs. James Lawrence Fly* and *John Lord O'Brian,* with whom *Solicitor General Jackson,* and *Mr. Paul A. Freund, Mr. William C. Fitts, Jr.,* and *Bessie Margolin* were on the brief, for appellees.

128

Mr. Justice Roberts delivered the opinion of the Court.

The Tennessee Valley Authority Act [1] erects a corporation, an instrumentality of the United States, to develop by a series of dams on the Tennessee River and its tributaries a system of navigation and flood control and to sell the power created by the dams. Eighteen corporations which generate and distribute electricity in Tennessee, Kentucky, Mississippi, Alabama, Georgia, West Virginia, Virginia, North Carolina, and South Carolina, and one

---

[1] Act of May 18, 1933, 48 Stat. 58, as amended by Act of August 31, 1935, 49 Stat. 1075; 16 U. S. C. § 831, *et seq.*

which transmits electricity in Tennessee and Alabama, filed a bill in equity, in the Chancery Court of Knox County, Tennessee, against the Authority and its three executive officers and directors. The prayers were that the defendants be restrained from generating electricity out of water power created, or to be created, pursuant to the Act and the Authority's plan of construction and operation; from transmitting, distributing, supplying or selling electricity so generated, or to be generated, in competition with any of the complainants; from constructing, or financing the construction of, steam or hydroelectric generating stations, transmission lines or means of distribution, which will duplicate or compete with any of their services; from regulating their retail rates through any contract, scheme or device; and from substituting federal regulation for state regulation of local rates for electric service, more especially by incorporating in contracts for the sale of electricity terms fixing retail rates. The defendants removed the cause to the United States District Court for Eastern Tennessee and there answered the bill. As required by the Act of August 24, 1937,[2] a court of three judges was convened which, after a trial, dismissed the bill.[3]

Fourteen of the complainants are here as appellants.[4] They contend that water power cannot constitutionally be created in conformity to the terms of the Tennessee Valley Authority Act, and the United States will, therefore, acquire no title to it, because it will not be produced as an incident of the exercise of the federal power to im-

[2] 50 Stat. 751, 752, 28 U. S. C. § 380a.

[3] 21 F. Supp. 947.

[4] Georgia Power Company was enjoined from maintaining the action. See Georgia Power Co. v. Tennessee Valley Authority, 17 F. Supp. 769; 89 F. 2d 218, 302 U. S. 692. Four other complainants have since been permitted to withdraw from the litigation without prejudice to its prosecution by the remaining appellants.

prove navigation and control floods in the navigable waters of the nation. They affirm that the statutory plan is a plain attempt, in the guise of exerting granted powers, to exercise a power not granted to the United States, namely, the generation and sale of electric energy; that the execution of the plan contravenes the Fifth, Ninth, and Tenth Amendments of the Constitution, since the sale of electricity on the scale proposed will deprive the appellants of their property without due process of law, will result in federal regulation of the internal affairs of the states, and will deprive the people of the states of their guaranteed liberty to earn a livelihood and to acquire and use property subject only to state regulation. The appellees contest these contentions. For reasons about to be stated we do not consider or decide the issues thus mooted.

The Authority's acts, which the appellants claim give rise to a cause of action, comprise (1) the sale of electric energy at wholesale to municipalities empowered by state law to maintain and operate their own distribution systems; (2) the sale of such energy at wholesale to membership corporations organized under state law to purchase and distribute electricity to their members without profit; (3) the sale of firm and secondary power at wholesale to industrial plants.

The appellants are incorporated for the purpose and with the authority to conduct business as public utilities. Several do so only within the states of their incorporation; those chartered elsewhere have qualified as foreign corporations under the laws of the states in which they manufacture, transmit, or distribute electricity. Most of them have local franchises, licenses, or easements granted by municipalities or governmental subdivisions but it is admitted that none of these franchises confers an exclusive privilege.

While the Authority has not built or authorized any transmission line, has not sold or authorized the sale of electricity, or contracted for, or authorized any contract for, the sale of electricity by others, in territory served by nine of the appellants, it has done some or all of these things in areas served or susceptible of service by five of the companies; and it plans to enter in the same way the territory of other appellants. It is clear, therefore, that its acts have resulted and will result in the establishment of municipal and coöperative distribution systems competing with those of some or all of the appellants in territory which they now serve, or reasonably expect to serve by extension of their existing systems, and in direct competition with the appellants' enterprises through the sale of power to industries in areas now served by them or which they can serve by expansion of their facilities. The appellants assert that this competition will inflict substantial damage upon them. The appellees admit that such damage will result, but contend that it is not the basis of a cause of action since it is *damnum absque injuria,*—a damage not consequent upon the violation of any right recognized by law.

The appellants invoke the doctrine that one threatened with direct and special injury by the act of an agent of the government which, but for statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent.[5] The principle is without application unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a priv-

[5] *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 619; *Stafford* v. *Wallace,* 258 U. S. 495, 512; *Massachusetts* v. *Mellon,* 262 U. S. 447, 488. The same rule applies to suits against state officers: *Osborn* v. *The Bank,* 9 Wheat. 738, 857, 859; *Terrace* v. *Thompson,* 263 U. S. 197, 214; *Sterling* v. *Constantin,* 287 U. S. 378, 393.

ilege.[6] The appellants urge that the Tennessee Valley Authority, by competing with them in the sale of electric energy, is destroying their property and rights without warrant, since the claimed authorization of its transactions is an unconstitutional statute. The pith of the complaint is the Authority's competition. But the appellants realize that competition between natural persons is lawful. They seek to stigmatize the Authority's present and proposed competition as "illegal" by reliance on their franchises which they say are property protected from injury or destruction by competition. They classify the franchises in question as of two sorts,—those involved in the state's grant of incorporation or of domestication and those arising from the grant by the state or its subdivisions of the privilege to use and occupy public property and public places for the service of the public.

The charters of the companies which operate in the states of their incorporation give them legal existence and power to function as public utilities. The like existence and powers of those chartered in other states have been recognized by the laws of the states in which they do business permitting the domestication of foreign corporations. The appellants say that the franchise to be a public utility corporation and to function as such, with incidental powers, is a species of property which is directly taken or injured by the Authority's competition. They further urge that, though non-exclusive, the local franchises or easements, which grant them the privilege to serve within given municipal subdivisions, and to occupy streets and public places, are also property which the Authority is destroying by its competition. Since

---

[6] *In re Ayers*, 123 U. S. 443; *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1; *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94; *Ex parte Young*, 209 U. S. 123; *Scully* v. *Bird*, 209 U. S. 481; *Philadelphia Co.* v. *Stimson, supra; Lane* v. *Watts*, 234 U. S. 525; *Truax* v. *Raich*, 239 U. S. 33; *Lipke* v. *Lederer*, 259 U. S. 557.

what is being done is justified by reference to the Tennessee Valley Authority Act, they say they have standing to challenge its constitutionality.

The vice of the position is that neither their charters nor their local franchises involve the grant of a monopoly or render competition illegal. The franchise to exist as a corporation, and to function as a public utility, in the absence of a specific charter contract on the subject, creates no right to be free of competition,[7] and affords the corporation no legal cause of complaint by reason of the state's subsequently authorizing another to enter and operate in the same, field.[8] The local franchises, while having elements of property, confer no contractual or property right to be free of competition either from individuals, other public utility corporations, or the state or municipality granting the franchise.[9] The grantor may preclude itself by contract from initiating or permitting such competition,[10] but no such contractual obligation is here asserted.

The appellants further argue that even if invasion of their franchise rights does not give them standing, they may, by suit, challenge the constitutionality of the statutory grant of power the exercise of which results in competition. This is but to say that if the commodity used by a competitor was not lawfully obtained by it the corporation with which it competes may render it liable in

---

[7] See *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 548; *Turnpike Co.* v. *The State,* 3 Wall. 210, 213; *Hamilton Gas Light Co.* v. *Hamilton City,* 146 U. S. 258, 268; *Pearsall* v. *Great Northern Ry. Co.,* 161 U. S. 646, 664.

[8] Compare *Lehigh Water Co.* v. *Easton,* 121 U. S. 388.

[9] *Joplin* v. *Southwest Missouri Light Co.,* 191 U. S. 150; *Helena Water Works Co.* v. *Helena,* 195 U. S. 383, 393; *Madera Water Works* v. *Madera,* 228 U. S. 454; *Green* v. *Frazier,* 253 U. S. 233; *Puget Sound Power & Light Co.* v. *Seattle,* 291 U. S. 619, 624.

[10] *Walla Walla* v. *Walla Walla Water Co., supra; Superior Water, L. & P. Co.* v. *Superior,* 263 U. S. 125.

damages or enjoin it from further competition because of the illegal derivation of that which it sells. If the thesis were sound, appellants could enjoin a competing corporation or agency on the ground that its injurious competition is *ultra vires*, that there is a defect in the grant of powers to it, or that the means of competition were acquired by some violation of the Constitution. The contention is foreclosed by prior decisions that the damage consequent on competition, otherwise lawful, is in such circumstances *damnum absqve injuria*, and will not support a cause of action or a right to sue.[11]

Certain provisions of state statutes regulating public utilities are claimed to confer on the appellants the right to be free of competition. Each of the states in which any of them operates, save Mississippi,[12] has established a commission to supervise and regulate public utilities. While the statutes [13] differ in their provisions, all but that of Virginia require a public utility to obtain a certificate of convenience and necessity as a condition of doing business. The appellants commenced business in the various states prior to the adoption of the requirement of such certificates and, so far as appears, they have none covering their entire operations. They have, however, obtained certificates for extensions made since the passage of the statutes; and they claim that, in any event, these

---

[11] *Railroad Co.* v. *Ellerman*, 105 U. S. 166, 173; *Alabama Power Co.* v. *Ickes*, 302 U. S. 464, 479–483, and cases cited; *Greenwood County* v. *Duke Power Co.*, 81 F. 2d 986, 997; *Duke Power Co.* v. *Greenwood County*, 91 F. 2d 665, 676; affirmed 302 U. S. 485.

[12] In Mississippi there is no State Commission, but municipalities are given the authority to regulate utilities within their territorial limits. Mississippi Code (1930) §§ 2400–1, 2414.

[13] Alabama Code (1928) § 9795; Carroll's Kentucky Statutes (1936) § 3952–25; North Carolina Code (1935) § 1037 (d); Williams' Tennessee Code (1934) §§ 5502–3; South Carolina Code (1934 Supp.) § 8555–2 (23); Virginia Code (1936) §§ 3693–3774k; West Virginia Code (1937) § 2562 (1).

laws afford them protection from the Authority's competition since any utility now seeking to serve in their territory must obtain a certificate, and hence they have standing to maintain this suit against the Authority which has none. The position cannot be maintained. Whether competition between utilities shall be prohibited, regulated or forbidden is a matter of state policy. That policy is subject to alteration at the will of the legislature.[14] The declaration of a specific policy creates no vested right to its maintenance in utilities then engaged in the business or thereafter embarking in it.

Moreover, the states in which the Authority is now functioning have declared their policy in respect of its activities. Alabama has enacted that federal agencies, instrumentalities, or corporations shall not be under the jurisdiction of its Public Service Commission;[15] that municipalities and improvement authorities may own and operate electric generating and distributing systems and may contract with a federal agency such as the Authority for the purchase of energy, and stipulate as to the use of the energy, including rates of resale;[16] that nonprofit membership corporations may be formed for the distribution among their members of electricity with like power to contract with the Authority for the required energy.[17] Tennessee has amended § 5448 of its Code, which defines public utilities, so as to exclude federal corporations such as the Authority from the jurisdiction of the State Utilities Commission;[18] has authorized municipalities to own and operate electric generating transmission and distribution systems and to contract for power

---

[14] Compare *Wheeling & B. Bridge Co.* v. *Wheeling Bridge Co.*, 138 U. S. 287, 292; *Williams* v. *Wingo*, 177 U. S. 601, 604.

[15] Alabama Acts, Regular Session 1935, No. 1.

[16] Alabama Acts, Regular Session 1935, No. 155.

[17] Alabama Acts, Regular Session 1935, No. 45.

[18] Tennessee Public Acts 1935, ch. 42, p. 98.

with the Authority on terms deemed appropriate, including the fixing of resale prices;[19] has authorized the formation of nonprofit membership electric corporations with like powers to contract.[20] Kentucky has authorized municipalities to establish and maintain light, heat, and power plants;[21] and has provided for the organization of nonprofit coöperative electric corporations which may contract with the Authority for purchase of energy and stipulate as to resale prices.[22] Mississippi, which has no state law for regulation of utilities, has empowered municipal and county governments to establish and maintain electric distribution systems which may buy power from the Authority and contract as to resale prices;[23] has created a rural electrical authority and authorized the formation of power districts and nonprofit competitives, all competent to purchase energy from the Authority and distribute it and to contract with the Authority as to resale rates to consumers.[24] The Authority's action in these states is consonant with state law, but, as has been shown, if the fact were otherwise, the appellants would have no standing to restrain its continuance.

As the Authority has not acted in any way in North Carolina, South Carolina, Virginia or West Virginia, the appellant's contention that its proposed entry into some or all of them confers a right to sue for an injunction against injury thereby threatened has even less support.[25]

---

[19] Tennessee Public Acts 1935, ch. 32, p. 28; Tennessee Public Acts 1935, ch. 37, p. 78.

[20] Tennessee Public Acts 1937, ch. 231, p. 882.

[21] Carroll's Kentucky Statutes (1936) §§ 3480 d-1 to 3480 d-22.

[22] Kentucky Acts, Fourth Extraordinary Session, 1936–1937, ch. 6, p. 25.

[23] Mississippi Laws, 1936, ch. 185, p. 354; ch. 271, p. 531.

[24] Mississippi Laws, 1936, ch. 183, p. 334; ch. 187, p. 370; ch. 184, p. 342.

[25] In fact several of the states in question have statutes which would to some extent, and in some circumstances, permit the pur-

The appellants may not raise any question of discrimination forbidden by the Fourteenth Amendment involved in state exemption of the Authority from commission regulation. For this reason *Frost* v. *Corporation Commission*, 278 U. S. 515, on which they rely, is inapplicable. Manifestly there can be no challenge of the validity of state action in this suit.

A distinct ground upon which standing to maintain the suit is said to rest is that the acts of the Authority cannot be upheld without permitting federal regulation of purely local matters reserved to the states or the people by the Tenth Amendment and sanctioning destruction of the liberty said to be guaranteed by the Ninth Amendment to the people of the states to acquire property and employ it in a lawful business. The proposition can mean only that since the Authority sells electricity at rates lower than those heretofore maintained by the appellants such sale is an indirect regulation of appellants' rates. But the competition of a privately owned company authorized by the state to enter the territory served by one of the appellants would, in the same sense, constitute a regulation of rates. The contention amounts to saying that competition by an individual or a state corporation is not regulation but competition by a federal agency is. In contracting with municipalities and nonprofit corporations the Authority has stipulated respect-

chase and use of power created by the Authority. In all of them municipalities may establish and operate their own distribution systems: North Carolina Code (1935) § 2807; South Carolina Code (1932) §§ 7278–7280, 8262; Virginia Code (1936) § 3031; West Virginia Code (1937) §§ 494, 591 (86). North Carolina and Virginia have statutes permitting the formation of coöperatives which may buy power from the Authority under contracts fixing resale rates: Public Laws of North Carolina, 1935, ch. 291, p. 312; Virginia Code (1936) ch. 159 A. South Carolina has created a State Rural Electrification Authority with power to buy electricity from any federal agency: South Carolina Code (1936 Supplement) §§ 6010–2 ff.

ing the price at which the energy supplied shall be resold by its vendees. That is said to be a regulation of the appellant's business. But it is nothing more than an incident of competition; it is but a method of seeking and assuring a market for the power which the Authority has for sale, and a lawful means to that end.[26] The sale of government property in competition with others is not a violation of the Tenth Amendment. As we have seen there is no objection to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the amendment.[27] These considerations also answer the argument that the appellants have a cause of action for alleged infractions of the Ninth Amendment.

Finally, it is asserted that the right to maintain this suit is sustained by certain allegations of concerted action by the officials of the Authority and the Public Works Administrator. The bill alleges that having adopted an unlawful plan the defendants have coöperated, and threaten to continue to coöperate in its execution, with Harold L. Ickes, as Administrator of the Federal Administration of Public Works, in a systematic campaign to coerce and intimidate the complainants into selling their existing systems in municipalities or territory in which the Authority desires to seize the market for electricity; that, in order to make this coercion effective, Ickes has, in coöperation with, or on request of, the Authority, announced loans and grants of federal funds to municipalities; that the Authority and Ickes have coöperated, and continue to do so, to force municipalities to purchase the

---

[26] *Oregon & California R. Co.* v. *United States*, 238 U. S. 393; *United States* v. *Gratiot*, 26 Fed. Cas. 12, 13–14; affirmed 14 Pet. 526.

[27] Compare *Georgia Power Co.* v. *Tennessee Valley Authority*, 14 F. Supp. 673, 676.

Authority's power under threats that, unless they do, proposed loans and grants for municipal systems will not be made. The bill states that, though Ickes "confederated and acted with the defendants in some of its illegal acts and is, therefore, a proper party, he is not a necessary party and is not joined as a defendant because he is beyond the jurisdiction of the court." There is a prayer that the defendants be restrained from confederating and acting in concert with Ickes for the described ends.

The District Court finds that the Authority has not indulged in coercion, duress, fraud, or misrepresentation in procuring contracts with municipalities, coöperatives or other purchasers of power; has not acted with any malicious or malevolent motive; and has not conspired with municipalities or other purchasers of power. The record justifies these findings. It is claimed, however, that they are inconclusive since the court erroneously excluded much proffered evidence tending to sustain the charge. An examination of the record discloses that certain of the evidence offered was properly excluded, and that in other instances the rejection of that offered constituted, at most, harmless error.

Error is assigned to the trial court's refusal to permit the taking of the deposition of the Public Works Administrator. In view of the prior opportunity which the claimants had to take this deposition, the lateness of the application, and other factors, permission to take the deposition was a matter within the court's discretion and it does not appear that the discretion was abused.

The remaining assignments of error directed to the exclusion of evidence of coöperation between the two federal agencies go to the rejection of evidence consisting largely of correspondence between them and press releases or announcements by officers of one or the other. The record contains all but a few of these rejected docu-

ments, those omitted apparently not being thought of importance. Scrutiny of them compels the conclusion that if the rejected evidence had been admitted, the trial court's holding that a conspiracy had not been proved should not be overruled.

The only findings on this subject requested by the appellants were to the effect that the Public Works Administration has coöperated with and assisted the Tennessee Valley Authority in the furtherance of the latter's power program and that the former has made contracts and allotments for loans and grants to twenty-three municipalities in the states of Alabama, Mississippi, and Tennessee, amounting to about fourteen million dollars, for the purpose of constructing municipal systems to distribute the Authority's power in competition with the appellants; that the applications for loan and grant in some instances specify that the municipal system will duplicate a privately owned system; in others that a large business will be done by the municipal plants because of the low promotional rates of the Authority; that some of the applications state they were filed to take advantage of the low rates offered by the Authority and that, with few exceptions, they state that the electricity to be distributed in the city will be purchased from the Authority. A further requested finding is that the applications of certain Alabama cities recite that they have secured written contracts from practically all consumers; that these contracts refer to lower rates to be secured, provided the rates charged by the city shall be thus prescribed by the Authority for resale at retail. The court refused to make the requested findings and error is assigned to this refusal. It is apparent that if the court had made the findings no conclusion of confederation or conspiracy, with malicious intent to harm the appellants or to destroy their business, would thereby have been required.

Coöperation by two federal officials, one acting under a statute whereby funds are provided for the erection of

municipal plants, and the other under a statute authorizing the production of electricity and its sale to such plants, in competition with the appellants, does not spell conspiracy to injure their business. As the court below held, such coöperation does not involve unlawful concert, plan, or design, or coöperation to commit an unlawful act or to commit acts otherwise lawful with the intent to violate a statute.

In no aspect of the case have the appellants standing to maintain the suit and the bill was properly dismissed. The decree is

*Affirmed.*

MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE BUTLER.

The decision just announced goes too far. It excludes from the courts complainants seeking constitutional protection of their property against defendants acting, as it is alleged, under invalid claim of governmental authority in setting up and carrying on a program calculated to destroy complainants' business. The issues joined by the parties, tried below and fully presented to this Court, include the question whether, when construed to authorize the things done and threatened by defendants, the challenged enactment is authorized by the Constitution or repugnant to the Fifth, Ninth, and Tenth Amendments. The issues also include the question whether, as being applied, the Act is void because the execution of defendants' program will deprive complainants of their property without due process of law in contravention of the Fifth Amendment. This Court holds complainants have no standing to challenge the validity of the Act and puts aside as immaterial their claim that by defendants' unauthorized acts their properties are being destroyed.

The opinion states: "The Authority's acts which the appellants claim give rise to a cause of action, comprise (1) the sale of electrical energy at wholesale to municipalities empowered by state law to maintain and operate their own distribution systems; (2) the sale of such energy at wholesale to membership corporations organized under state law to purchase and distribute electricity to their members without profit; (3) the sale of firm and secondary power at wholesale to industrial plants."

That the substance of complainants' case may not be so compressed is disclosed by the summary of their bill that follows:

Complainants are 19 public utilities. Each, authorized by law, is engaged in generating and selling electricity within the political subdivisions of various States. Some have long-term contracts under which they furnish large quantities of electricity. They are more than able to fill the needs of the territories in which they operate and are ready to supply such additional facilities as may be needed in the future. Their properties are modern and economically operated and possess great value as going concerns. Their rates yield no more than a reasonable return and are fully regulated by the States in which they serve.

Defendants are the Tennessee Valley Authority, a body corporate created by the Act of May 18, 1933, with the right to sue and be sued, and its three directors; charged with the duty of exercising the powers of the Authority. Harold L. Ickes, the Administrator of the Public Works Administration, has confederated with defendants in some acts charged to be illegal; he is not sued because beyond the jurisdiction of the court. From its principal office at Knoxville, Tennessee, the Authority carries on a proprietary business as a public utility for the generation, transmission, distribution and sale of electricity in Tennessee, Mississippi, Georgia and Alabama.

On its face, the Act discloses purpose to authorize a large and indeterminate number of great works for the primary purpose of creating a vast supply of electric power, to use this power to establish the United States in the business of producing, transmitting, and selling electric power, and to dispose of this power in a manner inconsistent with the principles of our dual system and so as to govern the concerns reserved to the States. Any references in the Act to navigation or to any other constitutional objective are unsubstantial and mere pretenses or pretexts under which it is sought to achieve an object reserved to the States. Except with respect to power available at Wilson Dam prior to the acts complained of, the program is one of creating an outlet for power deliberately produced as a commercial enterprise to be sold in unlawful and destructive competition with power now available in adequate quantities.

The program contemplates ultimately the development of all power sites on the Tennessee River and all its tributaries as an integrated electric power system, the construction and operation of hydro-electric plants at these sites, the use of auxiliary steam plants, the interconnection of all plants, and the elimination of existing privately owned utilities.

In the area of over 40,000 square miles, there are 149 water power sites which, with auxiliary steam plants, will produce 25 billion k. w. h. annually. Present consumption of the area is 56% of that quantity. The electric power to be produced by defendants can only be sold through displacement of the complainants. Execution of the program will necessarily destroy all or a substantial part of the business and property of each of the complainants.

Defendants have taken over Wilson Dam and the nitrate plant and have commenced, or recommended to Congress, the construction of 10 other dams; their pro-

gram calls for 11 completed dams by July 1, 1943. They have prepared plans for the construction of high-tension transmission lines from the dams to at least 14 cities and indeed to the whole area. They have purchased or are attempting to purchase distribution systems in at least 15 cities. They have entered into contracts to sell power to various communities and industries for a 20-year period and have agreed to supply firm power to other and larger cities.

The avowed purpose of the program is to effect a federal regulation of intrastate electric rates and service by a so-called "yardstick" method or "regulation by competition." The yardstick for wholesale rates is the wholesale rate charged by the Authority. It is unreasonable and confiscatory as a measure of complainants' rates in that it excludes the cost of the major part of the investment necessary to render the service and excludes necessary operating expenses. The yardstick for retail rates is the sum of the wholesale rate and the amount which the Authority allows municipalities to add to the wholesale rate to cover cost of local distribution; it excludes many items of necessary cost of rendering the service.

Pursuant to a plan promulgated in 1933, defendants are conducting a systematic campaign for the purpose of disrupting the established business relations between complainants and their customers, destroying the good will built up by complainants, seizing their markets and inciting the residents of communities served by them to coöperate with defendants in their scheme to develop an absolute monopoly.

With full knowledge of the noncompensatory and confiscatory character of the yardstick rates, they have represented to the inhabitants of communities served by complainants that these "yardsticks" were fair measures of reasonable rates and have thereby attempted to incite the

inhabitants to build publicly owned systems using power furnished by the Authority, to lead them to believe that they are being charged unreasonable rates, to stir up political agitation against privately owned utilities and to bring complainants into disrepute and disfavor.

The defendants attempt to coerce complainants to sell distribution systems and transmission lines, in territories which defendants intend to appropriate, at prices far below fair value by threatening that, unless complainants accede, they will construct, or cause to be constructed, duplicate facilities subsidized in construction and operation by federal funds and render complainants' properties wholly valueless. The Administrator of the Public Works Administration has coöperated with defendants. Defendants inform the owners that, unless they sell, either the Authority or the municipalities will build duplicate systems with federal funds. At defendants' request, the Administrator authorizes and announces a gift to the municipality of from 30% to 45% of the cost of the duplicate system and agrees to lend the balance, repayable out of earnings, if any, of the duplicate plant, upon condition that the municipality will agree to use power of the Authority and will, as soon as possible, oust the existing utility. If the utility agrees to sell, the allotments are canceled without regard to the will of the municipality. This policy has already been applied in certain cities. The defendants and Administrator also coöperate to force municipalities to agree to purchase power furnished by the Authority by threats that otherwise federal allotments for public works will be canceled or denied.

Defendants have caused bills, designed to forward their power program, to be submitted to the legislatures of various States in the area and have lobbied for and brought about their passage. They have installed Authority personnel throughout the area to disseminate

propaganda in behalf of the program. The Electric Home and Farm Authority, a corporation set up as a governmental agency of which the individual defendants are directors, finances sale of electrical devices, prints and circulates costly advertising in praise of the Authority program. Defendants have offered to supply electricity to large industrial customers of some of the complainants at noncompensatory and discriminatory rates. They have attempted to persuade complainants' customers to break existing contracts. Complainants cannot meet this competition because of the noncompensatory rates and because they are forbidden by state law to make discriminatory rates.

The bill prays invalidation of the Act as unconstitutional and injunction and other relief against defendants.

Unquestionably, the bill shows that complainants are not asserting a right held, or complaining of an injury sustained, in common with the general public. They allege facts that unmistakably show that each has a valuable right as a public utility, non-exclusive though it is, to serve in territory covered by its franchise, and that, inevitably the value of its business and property used will suffer irreparable diminution by defendants' program and acts complained of. If, because of conflict with the Constitution, the Act does not authorize the enterprise formulated and being executed by defendants, then their conduct is unlawful and inflicts upon complainants direct and special injury of great consequence. Therefore, they are entitled to have this Court decide upon the constitutional questions they have brought here. See *Massachusetts* v. *Mellon,* 262 U. S. 447. 488; *Frost* v. *Corporation Commission,* 278 U. S. 515, 521.

Mr. Justice McReynolds joins in this opinion.