Fred A. Nachman and Others, Suing in Behalf of Themselves and All Other Similarly Situated Holders of Bonds of Both Series A (Six Per Cent, Due June 1, 1947) and the Five Per Cent Series, Due June 1, 1956, Issued under and Secured by the First and Refunding Mortgage, Dated June 1, 1922, as Amended and Supplemented, of The Tennessee Electric Power Company, and Others, Plaintiffs, *v.* The Tennessee Electric Power Company and Others, Defendants.

Supreme Court, Special Term, New York County, June 5, 1940,

*Sabin & Puner* [*Abraham Marcus* of counsel], for the plaintiff Samuel Schuhman.

*Lester Grossman* [*Abraham Marcus* of counsel], for the plaintiffs Johan H. G. Franco and Robert Franklin.

*Samuel Zinman* [*Abraham Marcus* of counsel], for the plaintiff Ernst & Company.

*Irving D. Friedman* [*Abraham Marcus* of counsel], for the plaintiff Henry A. Abrams.

*Weadock & Whiting*, for the defendant The Tennessee Electric Power Company.

*Winthrop, Stimson, Putnam & Roberts*, for the defendant The Commonwealth and Southern Corporation.

*Shearman & Sterling*, for the defendants City Bank Farmers Trust Company (as successor to The National City Bank of New York) and William W. Hoffman, as trustee.

COLLINS, J. This consolidated action of four separate suits stems from identical facts and presents issues fundamentally alike.

Plaintiffs are holders of bonds or of bond coupons issued pursuant to the mortgage of defendant Tennessee Electric Power Company, dated June 1, 1922, under which defendants City Bank Farmers Trust Company and William W. Hoffman were trustees.

As of August 15, 1939, Tennessee's outstanding bonds aggregated $39,790,800, representing a six per cent series due June 1, 1947, of $20,569,300, and a five per cent series due June 1, 1956, of $19,221,500.

Tennessee had the option to redeem the bonds before maturity on payment of a five per cent premium. It is this five per cent which constitutes the pivot round which the litigation revolves, inasmuch as the corporate trustee, exercising the discretion vested in it by the trust indenture, and deeming it for the best interest of the bondholders, on August 15, 1939, declared the principal of all the outstanding bonds immediately due and payable at par and accrued interest. The bases for such declaration were defaults under the mortgage, occasioned by the dissolution of Tennessee, following the transfer of its electric properties to T. V. A. for $78,600,000.

At the time of trial the holders of $38,788,000 principal amount, or 97.48 per cent, of the outstanding bonds had surrendered their bonds and accepted payment of principal and interest, and those bonds, accordingly, had been canceled.

One of the actions — that of the plaintiff Abrams — is on coupons. The other plaintiffs sue as representatives of the class who have

not surrendered their bonds. At the time of trial this hold-out class possessed a total of $1,002,800 in principal amount, the plaintiffs holding $196,000 thereof, of which $189,000 were purchased subsequent to the public announcement on February 4, 1939, that the bonds were to be canceled on the basis of par plus accrued interest. Abrams acquired his coupons, annexed to bonds, on October 26, 1939 — over two months after the bonds had been declared matured and payable and payment had been made.

The plaintiffs challenge the trustee's action in accelerating the maturity date of the bonds without paying the five per cent premium — in addition to par and interest. It is not maintained that any bondholder suffered a loss. The burden of the challenge is that the defendant Commonwealth and Southern Corporation, by virtue of its ownership (in addition to bonds) of virtually all of the common stock of Tennessee, profited by the transaction to the extent of $2,622,811, in that the surplus of the sale's avails, after the payment of principal and par for the bonds and preferred stock, went to Commonwealth, Commonwealth thus receiving that much more on its common stock. To have paid the premium, argue the plaintiffs, would have merely diminished the excess which Commonwealth acquired.

The plaintiffs assert that there was no actual or authentic default; that the default declared by the trustee was fictional, contrived by the defendants as a stratagem to effect acceleration, and thus circumvent redemption at 105.

Not only are the salient facts free from entanglement, but they are without contradiction. Indeed, the chief actors in the transaction, those responsible for its consummation on defendants' behalf — Wendell L. Willkie, Commonwealth's president, and George Roberts, of Winthrop, Stimson, Putnam & Roberts, attorneys for Commonwealth; Lindsay Bradford, the president of the corporate trustee, Philip A. Carroll and Garrard Winston, of Shearman & Sterling, counsel for such trustee — these were summoned to the witness stand by the plaintiffs, and the testimony of the several witnesses called by the defendants was not gainsaid. Ergo, to hold that in doing what was done the defendants did not act in good faith and for the interest of the bondholders — including the plaintiffs — would involve a disbelief in the plaintiffs' own witnesses. The plaintiffs, to be sure, rely mainly on uncontradictable documentary evidence, on their interpretation of the trust indenture. But in determining the good faith of the defendants' conduct in the declaration of acceleration the oral testimony cannot be ignored; it must be invoked.

Tennessee Company was incorporated in Maryland in 1922 to generate, transmit and distribute electricity in Tennessee and Georgia. Its major business was in Nashville and Chattanooga. Also served were 450 other communities in sixty-four counties in eastern Tennessee and northwestern Georgia. In addition, street railway, bus lines and miscellaneous incidental businesses were operated. As of April 30, 1939, the outstanding securities of Tennessee were as follows:

| | |
|---|---:|
| Divisional bonds | $8,333,000 |
| First and refunding mortgage bonds | 39,790,800 |
| Preferred stock (redeemable at the option of Tennessee, in part at 110 per cent and in part at 105 per cent, but all on dissolution, payable at par), par value | 24,129,600 |
| Common stock, 425,000 shares of no par value (book value as of April 30, 1939) | 27,115,736 |

Of the common stock, Commonwealth held 99.35 per cent, which, on August 10, 1939, it transferred to its subsidiary Tennessee Utilities Corporation to effectuate the sale to T. V. A. Tennessee was then dissolved and its electric properties conveyed to Utilities as a liquidating distribution upon such common stock. Tennessee thereupon withdrew from the electric business, but through its directors acting as liquidating trustees continues the street railway and miscellaneous businesses.

This transfer and liquidation which, as stated, ensued from the sale to T. V. A., violated sections 44 and 45 of the mortgage, wherein Tennessee covenanted to maintain its corporate existence and to continue the business for which it was created. These violations — the transfer of its electric properties to Utilities without assumption of the mortgage, and withdrawing from business — constituted, so the trustee decided, defaults.

Under section 46 of the mortgage, Tennessee covenanted not to pay cash dividends except out of surplus earnings. The liquidating dividend by Tennessee, the trustee found, constituted another violation of the covenant, effecting default.

Section 89 of the mortgage provided that in case of such defaults, " the Trustee may, and upon written request of the holders of twenty-five percent. in aggregate principal amount of all the Bonds then outstanding, regardless of series or maturity, shall, by notice in writing mailed or delivered to the Company, declare the principal of all the Bonds then outstanding to be due and payable immediately; and upon any such declaration the same shall become and be immediately due and payable, anything in

this Indenture or in said Bonds contained to the contrary notwithstanding."

Each bond contained this provision: " in case of default by the Company, as set forth in the said Mortgage, the principal of all Bonds of each and every series issued and outstanding thereunder may be declared, or may become, due and payable in the manner and with the effect provided in the said Mortgage."

As noted, the trustee, confronted with corrosive competition, proclaimed a default on August 15, 1939, and announced that the principal of all bonds then outstanding were due and payable at par and interest.

The sale to T. V. A. was necessitated by threatened competition from the Federal government. The plaintiffs share defendants' belief that a continuation of the competition would have operated disastrously to Tennessee and thus rendered the bonds worthless. Tennessee employed litigation to forestall the competition, but lost. (*Tennessee Electric Power Co.* v. *Tennessee Valley Authority*, 306 U. S. 118; *Tennessee Electric Power Co.* v. *Ickes*, 304 id. 541.) Tennessee's bonds fluctuated; they declined to 48 in 1933 and to $65\frac{1}{8}$ in 1938. Foreseeing doom, and to salvage as much as possible, Commonwealth's president, Wendell L. Willkie, for five years negotiated for a sale of Tennessee's electric properties to T. V. A. At times it seemed that the bondholders' investment would be totally destroyed; certainly, considerably impaired. But, throughout, Mr. Willkie forthrightly insisted that the bonds be retired at par and interest. At no time was the payment of a bonus contemplated. Par and interest was the most sanguine and optimistic consummation any one aspired to achieve or hoped to obtain.

Mr. Willkie sought to persuade T. V. A. to assume the mortgage, but T. V. A. declined, and insisted that the mortgage be discharged. Serious tax problems were involved and required solution as a condition precedent. Mr. Willkie testified that if a redemption of the bonds had been insisted upon, no sale would have been made. Attest: " Q. Was there any discussion between you and your associates with respect to discussions with the trustee concerning redemption price or calling for redemption? A. I told all of my associates, including my counsel, that if there had to be any redemption of this issue of bonds, there would be no sale."

Again: " Q. Mr. Lillienthal did not tell you he was interested in what the bondholders and stockholders were going to get? A. Mr. Lillienthal and President Roosevelt told me in the early part of the transaction that was one thing the government would not do,— to have a premium on bonds or preferred stock. Q. They

told you that? A. President Roosevelt told me that. He said he thought the government should take it over without any payment of premiums. Q. But you reached an agreement of $78,600,000 on that date? A. If we could agree on all the other details. That is the reason I put in there 'Tentative.' Q. At that time you had not made any arrangements or agreement with the trustee, had you? A. No. Q. At that time you knew you were going to get $78,600,000 for this property, didn't you? A. I don't know how to answer that question, simply because of the reasons, I say the whole thing was tentative, it was as much tentative on whether or not I could get the bondholders from my standpoint to go along at par. I never would have made this agreement if the bondholders had not gone along at par."

The trustee's president, Lindsay Bradford, affirmed: " * * * We had had occasion to follow proceedings intimately in connection with Mr. Willkie's efforts to avoid the government competition, and naturally it had been a matter of concern to us as far as these particular bonds and preferred stock of this company was concerned. * * * my conclusion was that if Mr. Willkie was not successful in working out some deal with the Tennessee Valley Authority, that the future of the bondholders was very precarious."

The negotiations, as observed, culminated in a sale to T. V. A. for $78,600,000, which enabled payment of the bonds and preferred stock at par and left a surplus for the common stock.

Now, the plaintiffs do not assail this price as inadequate. Rather, they commend the deal and Mr. Willkie's sagacity in successfully promoting it. During the negotiations there was wide speculation in the bonds, terminated by Mr. Willkie's public announcement on February 4, 1939, that the bonds would be retired at par and interest.

Everything in connection with the deal was overt, as indeed it had to be, because authorization therefor was essential. The Federal Power Commission authorized the sale, as did the Railroad and Public Utilities Commission of Tennessee. Not only that, but the Securities and Exchange Commission, under the Public Utility Holding Company Act of 1935, was empowered to approve or disapprove the transaction. Under section 10(b) permission could be refused on a finding that the sale would be " detrimental to the public interest or the interest of investors or consumers." It is safe to assume that had it deemed such a course fair and proper, the Commission, under section 10(e) would, as it could, have imposed as a condition to the sale that the bonds be redeemed at 105. (*Securities and Exchange Commission* v. *United States Realty & Improvement Co.*, **310** U. S. 434.) After reviewing the facts the Commission found:

" By reason of the dissolution of the Tennessee Electric Power Company and the distribution of its electric properties to Utilities it is contended that that company will have violated one or more of the covenants contained in the First and Refunding Mortgage. The indenture permits the holders of 25% or more in the aggregate of the principal amount of the bonds to insist that the trustee declare the principal of all the outstanding bonds due and payable immediately in the event of a violation of such covenants, and Commonwealth, as the holder of more than 25% of the bonds, will so insist. It is also claimed that duplication of electric facilities by Tennessee Valley Authority and other public agencies and the threatened further duplication have jeopardized the security of the bondholders and for this reason among others the trustee has determined that upon these proposed steps being taken which will so violate the indenture it will be appropriate and advisable in the interest of the bondholders to accelerate the maturity.

" No legal precedents have been brought to our attention which sustain the legality of the proposed steps insofar as they purport to deprive non-assenting bondholders of the right to the premium which would be payable on redemption. An attempt on our part to decide the legal question as to whether maturity will have been duly accelerated would not be conclusive in any litigation between bondholders and the company. We think that it is in the interest of all classes of security holders affected that the applicants be permitted to consummate the proposed acquisitions and dispositions, leaving to the courts the determination of the rights of any bondholders who are unwilling to accept principal and interest as full settlement of their claims. Accordingly, no adverse findings are made with respect to any of the matters set forth in Section 10(b) or Rule U-12C-2 or Rule U-12F-1."

The above authority from governmental agencies was augmented by an act of Congress which enabled the effectuation of the transfer.

The query, then, which this case poses is whether the record projects a justification potent enough to evoke a juridical revamping of the setup.

That the bonds were not required to be redeemed is not disputed. Nor is it contradicted that there was no intention to redeem. More than that, it was not incumbent upon Tennessee to sell its electric properties to T. V. A. The mortgage provided that a foreclosure automatically matured the principal, and that out of the avails of the sale bondholders were to receive principal and interest, the surplus going to the equity of redemption. That foreclosure would have eventuated had the sale fallen through, is more substantial than mere imagination.

The testimony is that Commonwealth was advised that the sale would involve violations of covenants contained in the mortgage and that on such defaults the trustee was authorized by the mortgage, either in its own discretion or on the request of the holders of twenty-five per cent of the outstanding bonds, to accelerate the maturity of the bonds and upon receipt of payment of the principal and accrued interest, to release and discharge the mortgage.

The trustee made a full investigation of the situation and kept fully apprised of conditions. One of its assistant vice-presidents, Morris, made a comprehensive survey on the field, and even attended the arguments in the Supreme Court. There were numerous conferences. Finally, the decision was reached to accelerate the maturity. That the trustee was justified in so doing seems to be buttressed by the facts. The discretion should not lightly be disturbed. (*Meisel* v. *Central Trust Co.*, 179 App. Div. 795; affd., 223 N. Y. 589.)

The circumstance that Commonwealth, as the owner of twenty-five per cent of the bonds, requested the acceleration and indemnified the trustee in connection therewith, is not controlling, or even material, since the unimpeached evidence shows that the trustee exercised its discretion aside from Commonwealth's request, and that such action was predicated upon the trustee's independent study. Commonwealth's request was unnecessary. Consideration of it could be eliminated and the transaction still upheld as a sound and honest exercise of judgment. The trustee was empowered to accelerate without the request. The request was one conduit to acceleration; the exercise of discretion, independent of the request, another. Pursuit of both methods does not vitiate or weaken the result. The testimony firmly props the trustee's insistence that its decision was animated by its conception of what was best for the bondholders. This was not a passive trustee, not an automaton, and its decision was not, as the plaintiffs contend, a mere impress from Commonwealth's die. The trustee refused to act until at least 75 per cent of the outstanding bondholders sustained its judgment to accelerate, and at the time of the sale, August 15, 1939, approximately 84.48 per cent had given confirmation. In being solicited to deposit their bonds under the escrow agreement, the bondholders were presented with a complete picture of the circumstances; they acted with full knowledge of the facts. In view of the magnitude of the sum involved, and the public interest which attended the proceedings, the negotiations were accorded wide publicity. Probably no commercial transaction had been so publicized.

The negotiations proceeded on the basis of payment to bond-holders of par and interest; all steps had this basis in contemplation; Commonwealth relied on the formula.

Of course, if the trustee did what it had no right to do; if the indenture, under the circumstances, makes it obligatory to pay bondholders the premium, in addition to par and interest, then the plaintiffs must prevail, regardless of what Mr. Willkie intended or thought or acted on, and despite good faith. But I do not find the plaintiffs' position sustained in the indenture. There *was* a default. A *planned* default, perhaps. But a default conceived and executed in *mala fide*, no. If the sale had failed and foreclosure had resulted, a default, beyond question, would have been created. By declaring the default in the manner outlined, a ruinous default, with uncertain if not devastating consequences, was averted. Just what the plaintiffs might have gained had Tennessee committed suicide through the competition route, I cannot fathom. Oddly enough, the plaintiffs who, with other bond-holders, were the principal beneficiaries of the plan, are the only ones out to cavil.

In effect, the plaintiffs' thesis is this: They ask the court to hold that, despite the uncontradicted testimony of Mr. Willkie that the deal would have failed had redemption been insisted upon, the trustee, nonetheless, should have assumed the risk by refusing to accelerate and should have insisted on redemption. Surely no court would or could uphold such an attitude. The trustee might have found itself in a most uncomfortable situation had it declined acceleration and had the deal, as a consequence, collapsed. It may be, as the plaintiffs insinuate, that Mr. Willkie was bluffing and that he was working only for the interests of Commonwealth. But the proofs are overwhelmingly to the contrary. And for a trustee to have speculated on Mr. Willkie's sincerity by " calling his bluff " would have descended to gambling with trust property.

The plaintiffs repeatedly insist that they do not assail the integrity of the sale. How, then, can they escape the emphatic testimony that the sale would not have emerged had redemption been imposed as a prerequisite? They cannot, consistently or equitably, commend the rightness of the price and seek participation therein, and simultaneously reject the very terms which made the deal possible. It bears accenting to rule that the trustee was remiss or breached its trust would compel casting out the unimpeached testimony, and the substitution of conjecture for proof. Although reasonable inferences are permissible, such an

inference must have a factual premise; it cannot issue from the other.

The further circumstance that Commonwealth, as the holder of Tennessee's common stock, reduced its loss as such stockholder by the plan adopted, does not impress me as of sufficient weight to fasten upon it the additional burden of paying the bonus. Commonwealth was not, as I view it, unduly enriched at the expense of the bondholders. Commonwealth got what was due it — no more. And the bondholders received all that was legally and justly coming to them. Why the plaintiffs should receive more has not been shown to my satisfaction.

After a careful scrutiny of the record, I am unable to detect a foundation for the plaintiffs' claims. The chief virtue of equity is that it concerns itself with the spirit rather than with the letter. It looks at the entire transaction to see whether rights have been infringed. It is loath to accord a trust indenture so literal an interpretation as to work an injustice. If a broad, liberal construction will make for right, and a constricted interpretation work a wrong, the first course most certainly will be embraced. Consequently, the aim of the clauses under consideration, the objectives, the rights sought to be safeguarded — these are paramount. The mission of equity is to carry out the intention of the parties reasonably and justly so that the rights of all will be preserved and protected.

In the circumstances here, the bondholders, as I perceive it, were extremely fortunate. For them the sale was a windfall. A threatened loss was converted into a decided gain. Not a bondholder lost a penny. No one's rights were violated, no one's property confiscated. A five-year fight against odds terminated favorably to all concerned, including the plaintiffs. To have given the bondholders the premium would doubtless have been a handsome gesture. But the concern here is with *obligation*, not with generosity or gratuity.

My conclusion, then, is that the plaintiffs have not established a cause of action. The plaintiff Abrams, by virtue of his coupon holdings, does not occupy any stronger position than do his coplaintiffs. His coupons were subject to all the conditions appertaining to the bonds; it was so explicitly stated on the coupons themselves. (*Bailey* v. *County of Buchanan*, 115 N. Y. 297, 301; *Continental Securities Co.* v. *New York Central & H. R. R. R. Co.*, 217 id. 119, 125.) Having purchased his bonds subsequent to August 15, 1939, Abrams is deemed to have had notice of their status and worth.

The denial of plaintiffs' separate motions for an injunction *pendente lite* restraining the trustee from releasing the mortgage (Mr. Justice O'BRIEN); for summary judgment, and for judgment on the pleadings (both by Mr. Justice McCOOK), might suggest that those justices were persuaded that factual issues were present which impelled a trial. If the issues were legal, not factual, and their determination turnèd solely on documentary evidence, then the adverse rulings might be urged as now precluding the plaintiffs as a matter of law. However, the disposition of the preliminary motions has not guided, not even influenced, my findings. (*Bomeisler* v. *Forster*, 10 App. Div. 43, 48; revd. on other grounds, 154 N. Y. 229; *Bannon* v. *Bannon*, 270 id. 484; *Aberon Bakery Co., Inc.*, v. *Raimist*, 141 Misc. 774, 776; *Bard-Parker Co., Inc.*, v. *Crescent Mfg. Co.*, 174 id. 356.)

Inasmuch as this case presents a unique situation, precise precedents are not available, and there is a paucity of cognate cases. The patterns proffered by the plaintiffs as fitting this case are not of exact measurements, and they are, therefore inappropriate, primarily because in those cases the trustee did not exercise independent discretion, in good faith, and in circumstances here present. A sufficient summary of my conclusion is this: The trustee acted in absolute good faith, for the interest of the bondholders, and in accord with powers derived from the trust indenture; the plaintiffs suffered no detriment, nor has any one unjustly or wrongfully benefited at the bondholders' expense; lastly, no valid or cogent reason has been presented for a judicial disapproval of what 97.48 per cent of the bondholders have approved.

The court is grateful to counsel for their helpfulness. The several hundred pages of briefs and the approximately 650 requests to find give some indication of the extent and value of their labors.

In each action the complaint is dismissed on the merits. Findings passed upon. Settle decision and judgment accordingly. It may be that the defendants will desire to coalesce their findings and conclusions in the decision in such a way as to avoid redundancy.