[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2007
THOMAS K. KAHN
CLERK

No. 06-16561
Non-Argument Calendar
_____

D. C. Docket No. 06-01752-CV-AR-S

E. A. RENFROE & COMPANY, INC.,

Plaintiff-Appellee,

versus

CORI RIGSBY MORAN,
KERRI RIGSBY,

Defendants-Appellants,

KERRI MORAN,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 24, 2007)**

Before BLACK, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Cori Rigsby Moran and Kerri Rigsby appeal the district court's grant of a preliminary injunction ordering them to deliver to their former employer, E.A. Renfroe & Company, certain documents relating to the work of that company or its clients involving Hurricane Katrina-related insurance claims. After reviewing the record, we affirm the district court's order.

**I.**

The material facts are undisputed. Renfroe is a corporation headquartered in Birmingham, Alabama whose business includes supplying insurance companies with claims adjusters in the aftermath of natural disasters. The Rigsby sisters are former Renfroe adjusters who began working for the company in 1998. In 2005, Renfroe deployed the sisters to the Mississippi Gulf Coast as part of a team of claims adjusters to assist its client State Farm insurance company handle its Hurricane Katrina-related insurance claims.

While on this assignment for Renfroe, the sisters became convinced that State Farm was engaging in what they would later describe as "fraudulent and potentially criminal activities" related to the disposition of the insurance claims. As a result, the sisters copied some 15,000 State Farm claim-related documents

and decided to share them. The first recipient of the documents was Mississippi lawyer Richard Scruggs, who now represents them as their attorney (though not in this case) and who also (as of July 1, 2006) employs them as consultants. Scruggs in turn recommended that the sisters share the documents with the Mississippi Attorney General's office and the Federal Bureau of Investigation. The Rigsbys also discussed their find before a national television audience on August 25, 2006 when they appeared in a segment on the ABC News show "20/20" spotlighting the fraud allegations against State Farm.

After learning of the Rigsbys' activities, Renfroe sued the sisters on September 1, 2006, seeking monetary and injunctive relief, alleging that they had violated their employment contracts with Renfroe (which contained non-disclosure provisions) and the Alabama Trade Secrets Act. Shortly thereafter, Renfroe also moved the district court to issue a preliminary injunction commanding the return of the documents pending a full trial on the merits of their case.

After hearing the evidence, the district court issued Renfroe's requested preliminary injunction on December 8, 2006. It forbade the Rigsby sisters "and other persons in active concert . . . with them" from "further disclos[ing], us[ing] or misappropriat[ing]" any of the material in question, and also ordered them to:

> deliver forthwith to counsel for [Renfroe] all documents, whether

originals or copies, of each document and tangible thing, in any form or medium, that either of [the Rigsbys] or anyone acting in conjunction with . . . them, downloaded, copied, took, or transferred from . . . Renfroe or . . . any of its clients, including, but not limited to State Farm Insurance Company and which refer or relate to any insurance claims involving damages caused or alleged to have been caused by Hurricane Katrina in the State of Mississippi.

In light of an ongoing criminal investigation by the Mississippi Attorney General's office into the fraud allegations against State Farm, the district court exempted from the scope of the injunction disclosure of the documents to, and their use by, law enforcement officials. With those exceptions, the injunction ordered Renfroe's attorneys to keep all these documents in their possession "under lock and key." They were not to disclose any of the material "to any entity, including [their client] E.A. Renfroe & Company . . . without first obtaining the express written approval of [the district] court." They were, however, permitted to use the documents in this pending lawsuit. If they wished to share the documents with others, the attorneys were required to obtain written permission from the court after an in camera inspection by it.

Here we consider the Rigsby sisters' appeal of the district court's preliminary injunction order. We review the issuance of that order only for an abuse of discretion, see Church v. City of Huntsville, 30 F.3d 1332, 1341 (11th Cir. 1994); "[h]owever, if the trial court misapplies the law we will review and

correct the error without deference to that court's determination." Id.

## II.

Before exercising its discretion to issue a preliminary injunction, the district court was required to satisfy itself that Renfroe had demonstrated four things: (1) that Renfroe had a substantial likelihood of succeeding on the merits of its underlying lawsuit against the Rigsbys; (2) that Renfroe faced a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to Renfroe outweighed the harm the injunction would cause the Rigsbys; and (4) that granting the injunction would not disserve the public interest. Id.; see also Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1448 (11th Cir. 1991) (reviewing the issuance of a preliminary injunction in a diversity case under the federal standard for injunctive relief). The district court found that Renfroe had established each of these prerequisites, and the Rigsbys now challenge the court's findings on a number of grounds.

## A.

The Rigsbys first challenge the district court's finding that Renfroe was substantially likely to prevail on the merits of its claim that the Rigsbys violated

5

the confidentiality provisions in their employment contracts.[1]

One way they do this is by arguing (without citing any authority) that Renfroe "lack[ed] standing to seek an injunction whose result would be the return of documents that never belonged to Renfroe."  By this, we think the sisters mean that Renfroe hasn't suffered any "injury in fact," which is one of the three constitutionally-required prerequisites for standing.  See Koziara v. City of Casselberry, 392 F.3d 1302, 1304–05 (11th Cir. 2004).  The problem with this argument is that the breach of a contract has long been held to be among the types of injuries that confer standing to sue.  See, e.g., Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 137–38, 59 S. Ct. 366, 369 (1939) (standing is available where "the right invaded is a legal right,—one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege" (emphasis added)).  By pleading the breach of a contractual provision, Renfroe asserted a sufficient "injury in fact" for standing.

Another argument the Rigsby sisters make is that they were not bound by any written employment contract by the time they were working on the Hurricane Katrina-related claims.  They ask us to compare the four employment agreements

---

[1]  The preliminary injunction was premised solely on the district court's view that Renfroe was substantially likely to prevail on the breach-of-contract claims.  It did not reach Renfroe's claim under the Alabama Trade Secrets Act, and we have no occasion to do so either.

6

they signed in July 1998, September 1999, February 2000, and May 2004, with a fifth agreement they signed in June 2004 just before they began working on claims related to Hurricane Charley.

Paragraph 2(a) of all five of the employment agreements the sisters have put forward provides for an employment relationship maintained either on an "at-will" basis or "for an indefinite period." Paragraph 2(a) of the fifth agreement, signed in June 2004, contains an additional sentence not found in any of the first four agreements. That paragraph, in its entirety, reads:

> RENFROE engages the Employee to perform assignments which will vary in work type, length and location, according to the needs of our business. Employee will be employed by RENFROE from the time he is checked in at the assignment location until the time he is checked out at the assignment location. It is further understood that employment is at-will, the Employee accepts such employment on the terms and conditions set forth in this Agreement, and either party may terminate such employment at any time for any reason. Throughout employment, Employee will faithfully exercise such authority and perform such duties as are assigned from time to time by RENFROE.

(Emphasis added.) The underscored sentence is the one that was not in that paragraph in the earlier employment agreements. According to the sisters, this new sentence means that all of their contractual obligations "expired" when they checked out of their assignment location at the conclusion of their Hurricane Charley-related work in 2004. And, they argue, their Katrina-related work in 2005

7

was not subject to any contract, not that one or any one. If so, the confidentiality agreement contained in all the contracts, including the fifth and last one that they signed, does not apply to them.

We disagree. The sisters' singular focus on the sentence in paragraph 2(a) limiting the duration of their employment with Renfroe to the time between check-in and check-out at an assignment location ignores the other sentences in that same paragraph which contemplate an employment arrangement that will span multiple assignments and be governed by the same contract. For example, the first sentence of paragraph 2(a) explains that "RENFROE engages the Employee to perform assignments [in the plural] which will vary in work type, length and location, according to the needs of [its] business." And if that isn't clear enough, the sisters agreed in the final sentence of paragraph 2(a) to "faithfully exercise such authority and perform such duties as are assigned from time to time [as opposed to just once] by RENFROE." Reading the entire provision in context, we have no difficulty concluding that the language the Rigsbys rely on does not mean what they say it means. The June 2004 agreement, which is the fifth and last one, and the non-disclosure provision within it, covered the sisters' Katrina-related work. That work was one of those assignments that they received "from time to time."

8

The Rigsby sisters offer a number of fallback arguments concerning Renfroe's likelihood of ultimate success, but none of them have any merit either. For example, the sisters assert that "Renfroe has presented no evidence that the Rigsbys copied any documents that would fall within the confidentiality provisions of the employment agreements." But the confidentiality provisions at issue in this case apply very broadly, and under them, confidential information includes all:

> data and information relating to the business of RENFROE and its clients which is or has been disclosed to the Employee or which the Employee became aware as a consequence of or through employment with RENFROE and which has value to RENFROE or its clients but is not generally known to the public.

The Rigsbys admit in their answer that they provided some 15,000 pages of claims information to their lawyer, the FBI, and the Mississippi Attorney General. There is no suggestion that all those documents relating to Hurricane Katrina matters fell from the sky into their hands.

Another fallback argument is the sisters' assertion that Renfroe "has failed to prove that it has suffered any damages as a result of the Rigsbys' alleged breach of contract." This, however, ignores the fact that the Rigsbys actually acknowledged in their employment agreements that Renfroe would suffer "immediate and irreparable damage and loss" upon the breach of the non-

9

disclosure provision, which is why the provision was included to begin with.

Finally, the Rigsbys say that the public policy concern of ferreting out corporate wrongdoing justifies their breach of the contractual duty under the confidentiality provision and counsels against enforcement of it. But that concern is one that is adequately covered by disclosure of the alleged wrongdoing to state and federal law enforcement agencies. As Renfroe put it in its brief, "Renfroe makes no complaint about the Rigsbys' participation in any investigation by a governmental law enforcement agency. The fact that the Rigsbys gave copies of documents to the Mississippi Attorney General and [federal law enforcement] is not at issue in this litigation." As we explained earlier, the preliminary injunction, which is all that we have before us, permits disclosure to and use by law enforcement agencies.

For these reasons, we agree with the district court that Renfroe has demonstrated a substantial likelihood of succeeding on the merits of its claim that the Rigsby sisters violated their contractual duty to keep the claims files confidential.

B.

Having concluded that Renfroe is substantially likely to prevail on its breach-of-contract claim, we turn briefly to the three remaining preliminary

10

injunction requirements of irreparable injury, balancing the hardships, and consistency with the public interest.

Regarding the irreparable injury requirement, the Rigsbys have given us no reason to doubt the district court's conclusion that "[m]onetary damages are woefully inadequate as a means of addressing" the sisters' continued ability to "engage in public criticism of Renfroe's most important client" absent the injunction. The sisters do point out that State Farm has continued to use Renfroe's adjustment services since the Rigsbys' wholesale disclosure of the confidential information, and that at the November 14, 2006 preliminary injunction hearing, Renfroe's secretary-treasurer "could not name a single adjustor who had terminated their employment with Renfroe as a result of the Rigsbys' actions." However, neither of these facts calls into question the existence of the claimed injury to Renfroe's goodwill and reputation—which, as the district court noted, is "difficult to prove." See Ferrero, 923 F.2d at 1449 (noting that loss of goodwill can be an irreparable injury). Moreover, as the district court mentioned in its opinion, both sisters "expressly acknowledged in writing the virtual impossibility of quantifying the damages that would be caused by a breach of confidentiality, and expressly . . . authorized the remedy of a preliminary injunction as appropriate." We agree with the district court that Renfroe established the threat

of irreparable injury.

Finally, we also agree with the district court that Renfroe carried its burden on the balance-of-hardships and public interest requirements, the discussion of which the Rigsbys combine. They assert that the injunction is against public policy because it affords "the targets of criminal investigations [such as Renfroe's client, State Farm] the opportunity to access" the claims documents in question. This argument is illogical. If there is too much disclosure, the remedy is not total disclosure. The situation that the Rigsby sisters seek, the absence of any restraints on disclosure, would make all of the documents freely available to the world including any and all targets of any and all criminal investigations.

The sisters also argue that the injunction exposes them to criminal liability in Mississippi for violating subpoenas they have received requiring them to produce documents to a grand jury there. No, it doesn't. As we have said twice, the injunction specifically allows disclosure of the documents to "law enforcement officials."

**AFFIRMED.**