**CENTRAL LOUISIANA ELECTRIC COMPANY, Inc.,**

**v.**

**RURAL ELECTRIFICATION ADMINISTRATION, Norman M. Clapp, Administrator of the Rural Electrification Administration, the United States Department of Agriculture, and Orville L. Freeman, Secretary of The United States Department of Agriculture.**

Gulf States Utilities Company, Louisiana Power & Light Company, Intervenors.

Civ. A. No. 10552.

United States District Court
W. D. Louisiana,
Shreveport Division.

Nov. 18, 1964.

Jacob S. Landry, Jack J. Cousin, and William O. Bonin, Landry, Watkins, Cousin & Bonin, New Iberia, La., for plaintiff.

Edward L. Shaheen, U. S. Atty. for the Western District of Louisiana, Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., John C. Bagwell, General Counsel, Ralph F. Keobel, Asst. General Counsel, Louis Gorrin and Henry E. Freedman, Attys., United States Department of Agriculture, Washington, D. C., for defendants.

Tom F. Phillips, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for intervenor Gulf States Utilities Co.

Eugene G. Taggart, Monroe & Lemann, New Orleans, La., Thomas W. Leigh, Theus, Grisham, Davis, Leigh & Brown, Monroe, La., for Louisiana Power & Light Company.

BEN C. DAWKINS, Jr., Chief Judge.

## OPINION ON APPLICATION FOR TEMPORARY INJUNCTION

By this action Central Louisiana Electric Company (CLECO) seeks to enjoin consummation of a loan by the Rural Electrification Administration (REA) to Louisiana Electric Cooperative, Inc., in the amount of $56,521,000 to be used for construction of steam generation and transmission facilities. A hearing was held October 26, 1964, on a motion to show cause why a preliminary injunction should not be issued.

Plaintiff is a privately owned electric utility corporation organized under Louisiana laws and operating in this State.

Made defendants are the REA; its Administrator, Norman M. Clapp; and the U. S. Department of Agriculture and its Secretary, Orville L. Freeman. Louisiana Electric Cooperative, Inc., (Super Cooperative) was organized by twelve of the thirteen electric cooperatives which operate under Louisiana law.

Plaintiff is engaged in the business of generation, transmission, distribution and sale of electric service in some twenty-four, out of 64, parishes in this State. Among other customers, it furnishes wholesale electric power to six of the electric cooperatives which helped organize the Super Cooperative. Plaintiff complains that defendant Clapp approved the loan in violation of the Rural Electrification Act, 7 U.S.C.A. § 901 et seq., REA Bulletin 111–3, and the Fifth Amendment.

It is claimed that the result of consummation of the loan will be illegal competition with plaintiff, a denial of equal protection of the laws, a deprivation of property without due process of law, operation of an unregulated monopoly through Super Cooperative, and a violation of Louisiana laws governing public utilities. Plaintiff claims that the Administrator conspired with the Super Cooperative and its members to create an unregulated monopoly and to deprive plaintiff of its property and income. Plaintiff also alleges that in the negotiations preceding the loan approval the Administrator attempted to coerce plaintiff and other private electric companies to agree to so-called "territorial integrity" agreements which are alleged to be in violation of Louisiana laws.

The Rural Electrification Act, 7 U.S. C.A. § 901 et seq., authorizes the Administrator to make loans to finance construction of generating and transmission facilities for the furnishing of electric energy to persons in rural areas who are not receiving central station service. One of the limitations imposed by § 904 is that the loan shall not be made unless the consent of the State authority having jurisdiction in the premises has been obtained.

The Administrator set forth in REA Bulletin 111–3, 29 Fed.Reg. 2765 (1964), the requirements for consideration of a loan application under § 904. This bulletin states that no loan shall be granted except upon certification by the Administrator to the Secretary of Agriculture of the completion of a power supply survey showing that the loan is " * * * (c) needed because existing and proposed contracts to provide the facilities or service to be financed were found to be unreasonable, each supplier involved was so advised, REA attempted to have such contracts made reasonable, and the existing or other proposed suppliers had failed or refused to do so within the time set by the Administrator." Plaintiff contends that the requirements set forth in this bulletin have not been fulfilled.

Evidence adduced at the hearing held on the motion to show cause, virtually none of which was contradicted by defendants, reveals that the Super Cooperative applied for the loan in question August 3, 1962. After extended negotiations between the Administrator, the private electric companies and the electric cooperatives, the Administrator advised plaintiff February 13, 1964, that future power arrangements must meet three requirements: (1) the cooperatives must obtain power at the lowest possible cost under relatively short-term contracts; (2) the cooperatives must be assured contractually of an adequate power source and of its availability to meet future needs; and (3) means must be found, legislatively or otherwise, to assure the territorial integrity of the cooperatives.

During negotiations which followed, the evidence shows that plaintiff submitted proposals which attempted to offer reasonable solutions to the first two requirements set forth by the Administrator. It was shown that CLECO offered to supply the complete electric requirements of the cooperatives it served under contracts with a term of ten years and at a rate of 6.25 mills per kilowatt-hour.[1] Although the Administrator indicated in the affidavit he submitted that "the rates offered by the existing power sources would result in higher costs of power for the consumers involved than the costs from the facilities to be financed by the aforesaid loan," evidence was offered by CLECO to show that the rates it offered were lower than the rates the Super Cooperative would have to charge after construction of its proposed facilities for generation and transmission of electric power.

One exhibit introduced by plaintiff showed the rates of the twelve largest REA financed generation and transmission cooperatives during the twelve month period ending June 30, 1963. The average rate charged by these cooperatives was 10.04 mills per kilowatt-hour, ranging from a low of 6.84 mills to a high of 15.72 mills per kilowatt-hour. The opinion of Douglas G. Wright, Administrator of the Southwest Power Administration, in his testimony before the Senate Subcommittee on Appropriations, 88th Congress, was that the best rates that could be offered by the Super Cooperative would be 7.5 to 8 mills per kilowatt-hour. The Administrator himself indicated in the statement of information attached to his certification to Congress that the cost of power to the cooperatives under the generation and transmission plan would be 6.8 mills per kilowatt-hour.

Plaintiff offered contracts with a term of ten years, and in a letter of February

1. In addition, the testimony of F. Hugh Coughlin, president of CLECO, indicated that the average rate for CLECO, Louisiana Power & Light Company and Gulf States Utilities Company under currently effective schedules for a period ending June, 1964, would have been 6.39 mills per kilowatt-hour. Under the available rates, the average would have been 6.04 mills per kilowatt-hour.

Coughlin also testified that he had prepared a compilation of the average rate per kilowatt-hour for the thirty-five largest privately owned suppliers of electric power to REA financed cooperatives during the period ending June 30, 1963. During that period CLECO's average rate was 6.90 mills per kilowatt-hour as compared to an overall average rate of 7.49 mills per kilowatt-hour.

29, 1964, to five of the cooperatives indicated that it would not object to an agreement providing for a redetermination of rates at the end of five years. CLECO's president testified that it is probable, and in fact required as security for the proposed loan, that the contract term between the cooperatives and the Super Cooperative will be thirty-five years, a term equal to the term of the loan in question.

There also was evidence showing that the reliability of the service now received from plaintiff would be greater than that achieved under the proposed facilities. This is due to the fact that plaintiff and the other privately owned suppliers have numerous interconnections, so that a breakdown of one or more of their lines likely would not affect service to the cooperatives. However, it was shown that under the best information available to plaintiff the facilities proposed by the Super Cooperative would contain only a single interconnection with the Southwestern Power Administration in Arkansas.[2]

As to the Administrator's third requirement, plaintiff advised him that, since plaintiff was subject to the jurisdiction of the Louisiana Public Service Commission which regulated plaintiff's activities, its attorneys had advised that any contractual agreement concerning the protection of the territory of the cooperatives would be illegal.[3] Plaintiff suggested that legislation would be the proper solution to that particular problem.[4] However, after further negotiations and an unsuccessful attempt to pass such legislation in Louisiana, no agreement ever was reached between the parties concerning the "territorial integrity" issue.

Plaintiff contends that the Super Cooperative is subject to regulation by the Louisiana Public Service Commission; and that before the generation and transmission facilities can be constructed with the loan funds, the Super Cooperative must obtain a certificate of convenience and necessity from that Commission. LSA–R.S. 45:121, 45:123 (1950).[5]

2. Throughout the negotiations for the loan the Administrator kept the details of the loan application and the proposed facilities secret. However, a map showing the proposed facilities, which the Court ordered produced at the hearing, shows this to be the only interconnecting line with other electric power systems.

3. In this contention plaintiff relies on LSA–R.S. 33:4401 (1950):
"The governing authorities of all municipalities with a population not exceeding twenty-five thousand may grant a franchise to any person to use and occupy the streets, alleys, and public places therein, and to obstruct the same or any part thereof, by constructing, maintaining, and operating (1) poles, wires, and appurtenances for telephone, telegraph, and electric transmission and distribution systems and (2) pipe-lines, mains for a gas transportation and distribution system. These franchises *shall not be exclusive,* nor be for a longer period than twenty-five years and shall be subject to any terms, conditions and stipulations prescribed by the governing authorities of the municipalities. This Section shall not apply to municipalities which are required under the provisions of their charter

to hold referendum elections to grant or lease franchises." (Emphasis added.)

4. The Administrator agreed with this suggestion, for in his letter to plaintiff, he said:
"The appropriate means of effectuating a delineation of service areas is, of course, a matter which must be resolved by the interested parties in Louisiana. However, from our discussions and in the light of the legal problems involved, it appears that the enactment of State legislation is probably the only legally effective means available."
The Administrator also testified to this effect before the Subcommittee of the Committee on Appropriations, U. S. Senate, 88th Congress, 2nd Session, on H.R. 11202, *Agricultural Appropriations for 1965,* p. 160.

5. LSA–R.S. 45:121 (1950):
"The term 'electric public utility' as used in this Chapter means *any person furnishing electric service,* within this state, the parish of Orleans excepted." (Emphasis added.)
LSA–R.S. 45:123 (1950):
"In order to encourage a further development of coordinated state-wide electrification based upon a planned

Plaintiff also alleges that defendants failed to require the Super Cooperative to obtain the certificate of convenience and necessity before the loan was granted, and that this failure constituted a violation of 7 U.S.C.A. § 904.[6]

Defendant contends, on the other hand, that the Super Cooperative is exempted purportedly from the jurisdiction of the Louisiana Public Service Commission by the provisions of LSA–R.S. 12:326 (1950).[7] Plaintiff counters that this section does not apply to the Super Cooperative because of the provisions of LSA–Const. (1921) Art. 6, § 4,[8] and contends that any attempted application of that section in contravention of the cited constitutional provision would result in invalidity of the section.

■ Defendants' primary contention is that there has been no violation of law in the approval of the loan and that, if a violation is found, plaintiff has no "standing" to bring this suit. Such latter argument, in our judgment, is a

rather left-handed approach to a fundamental proposition which attempts technically to abrogate plaintiff's basic rights. In this position the defendant relies on Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (1955), and decisions of the Supreme Court in Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L. Ed. 543 (1939), and Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

■ The cited cases indeed have established the rule that an electric utility company, whose *only* interest is that it may suffer from *lawful* competition in a public power program, has no standing to enjoin execution of such a program. Thus, if nothing more than *lawful* competition will result from consummation of the loan in question, plaintiff has no "standing" to sue.

■ In Alabama Power Co. v. Ickes, supra, an Alabama electric power company with a non-exclusive franchise sued

economy, an electric public utility shall not render or extend its electric services or facilities to customers already receiving electric service from another electric public utility *without first obtaining a certificate of public convenience and necessity from the Louisiana Public Service Commission.* The Commission shall grant such a certificate only in the event that the electric service already being rendered is inadequate, or that the rates for such electric service are unreasonable." (Emphasis added.)

6. 7 U.S.C.A. § 904:
"* * * *And provided further,* That no loan for the construction, operation, or enlargement of any generating plant shall be made unless the consent of the State authority having jurisdiction in the premises is first obtained."

7. LSA–R.S. 12:326 (1950):
"Cooperatives transacting business in this state pursuant to this Part shall be exempt in all respects from the jurisdiction and control of the Public Service Commission of this state."

8. LSA–Const. (1921) Art. 6, § 4:
"Public service commission; powers
"Section 4. The Commission shall have and exercise all necessary power

and authority to supervise, govern, regulate and control all common carrier railroads * * * *electric light*, heat and *power*, water works * * * *and other public utilities* in the State of Louisiana, and to fix reasonable and just single and joint line rates, fares, tolls or charges for the commodities furnished, or services rendered by such common carriers or public utilities, except as herein otherwise provided.
"The power, authority, and duties of the Commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities hereby, or which may hereafter be made subject to supervision, regulation and control by the Commission * * * *.*" (Emphasis added.)
In this connection we note that the Louisiana Supreme Court has held that an act of the Legislature which conflicts with a constitutional provision is invalid. City of Monroe v. Louisiana Public Service Commission, 233 La. 478, 97 So.2d 56 (1957); State v. Smith, 209 La. 363, 24 So.2d 617 (1945); State v. Franklin, 202 La. 439, 12 So.2d 211 (1943); Scott v. Ratcliff, 167 La. 237, 119 So. 33 (1928).

to enjoin the granting of loans under the National Industrial Recovery Act to municipalities for the construction of electric distribution systems. Although the court held the power company had no standing to sue to enjoin the *lawful* competition, Justice Sutherland, writing for the court, was careful to point out that, "There was and is *no conspiracy* between any of the defendants and any other person, nor is there any other effort on the part of any of the defendants to, *nor are their actions motivated by a desire to, cause injury or financial loss to the plaintiffs*, or to regulate their rates or electric rates generally, or to foster municipal ownership of utilities." [9] (Emphasis added.) Shortly after making this statement, the Justice added:

> "If conspiracy or fraud or malice or coercion were involved a different case would be presented [Emphasis added], but in their absence plainly enough, the *mere* consummation of the loans and grants will not constitute an actionable wrong." (302 U.S. at 479, 58 S.Ct. at 304) [10]

He closed the opinion by distinguishing many other cases on the ground that they involved "fraud, coercion, malice, conspiracy, or some other element or condition of controlling force—none of which * * * exists in the present case." [11]

Likewise, in Tennessee Electric Power Co. v. TVA, supra, Justice Roberts, speaking for the majority, took great care to point out:

> "The District Court finds that the Authority has not indulged in coercion, duress, fraud, or misrepresentation in procuring contracts with municipalities, cooperatives or other purchasers of power; has not acted with any malicious or malevolent motive; and has not conspired with municipalities or other purchasers of power. The record justifies these findings." (306 U.S. at 145, 59 S. Ct. at 373)

The Court then concluded that cooperation by federal officials acting under different acts to establish a power program *in competition* with private utility companies "does not spell conspiracy to injure their business." [12]

It is true that in McKay, supra, the Court reviewed the Supreme Court decision in Alabama Power and TVA and concluded that "conspiracy allegations of the type made here—based on allegedly unlawful acts in violation of statutes—do not establish a right to sue.[13]

But we think the allegations of conspiracy in this case go substantially further than those indicated in any of the three cases discussed above. Although this case has not yet been tried on its merits, we must accept as *prima facie* evidence the allegations of the petition, which are reasonably substantiated by the evidence introduced at the hearing.

This *prima facie* evidence shows that much more is involved here than the mere consummation of a loan which will result in *lawful* competition. Rather than showing merely an attempt to compete with plaintiff, the testimony shows that there has been a concerted effort on the part of defendants, the Super Cooperative and its member cooperatives to *obliterate* completely the wholesale electric power business of plaintiff. If this loan is successfully completed and the proposed facilities built, there will be only one electric cooperative in Louisiana, not a member of the Super Cooperative, still purchasing electric power from private electric companies in Louisiana, and

---

9. 302 U.S. at 477, 58 S.Ct. at 302.

10. While this statement must be regarded as dicta, we note that our Fifth Circuit has indicated that dicta by the Supreme Court should be followed by District Courts in making their decisions. See Randazzo v. United States, 339 F.2d 79 (5 Cir. 1964).

It should be added that the view expressed in the quoted statement is in full accord with that of this Court.

11. 302 U.S. at 485, 58 S.Ct. at 306.

12. 306 U.S. at 147, 59 S.Ct. at 374.

13. 225 F.2d at 930.

that cooperative does not purchase any electric power from plaintiff.

Thus, even though plaintiff has introduced uncontradicted evidence to show that it has offered electric power to the cooperatives at a rate lower than that which is most likely to be offered by the Super Cooperative, and at a contract term of 10 years, which is shorter than that probably to be offered by the Super Cooperative, the result of the proposed loan and construction of facilities will be that the cooperatives and other defendants will have accomplished the complete *obliteration* of plaintiff's wholesale power business. The "actions motivated by desire to cause injury or financial loss" to plaintiff, which Justice Sutherland found missing in Alabama Power clearly appear to be present here. There also is an obvious and envious desire to foster ownership of electric utilities by cooperatives rather than by private electric companies.

Another manner in which the facts here surpass exceedingly those of TVA, Alabama Power and McKay is in the obstinate, uncompromising insistence of defendants in attempting to bludgeon plaintiff into a territorial immunity agreement.[14]

The Administrator emphatically advised plaintiff that the loan would be granted unless such an agreement was reached. When plaintiff refused, on advice of counsel that such an agreement would contravene Louisiana law, he granted the loan.

We need not decide here that such an agreement would have violated Louisiana law, but the adamant insistence of the Administrator upon this type of agreement, in light of his own admission of doubt as to its legality,[15] clearly makes a *prima facie* showing of an unwonted attempt to coerce plaintiff into such an agreement and to destroy its business upon its refusal (which we are convinced that it did).

Moreover, it is shown that REA Bulletin 111–3 was published after the decisions in McKay, TVA, and Alabama Power. While this Bulletin does not have the force of law, it clearly delineates a basic policy directed to be published in the Federal Register by the appropriate Congressional Committee, and which the Administrator ought to follow. Plaintiff here alleges that the procedure followed by the Administrator in approving the loan did not follow the requirements outlined in the Bulletin. Proof of this allegation would further add to likely conspiracy between defendants, the cooperatives and the Super Cooperative.

The further allegation that defendants violated 7 U.S.C.A. § 904 by failing to require the Super Cooperative to obtain a certificate of convenience and necessity from the Louisiana Public Service Commission adds powerful suasion to the allegations of conspiracy and coercion. While we are not called upon at this time finally to decide that question of law,—i. e., as to whether LSA–R.S. 12:326 (1950), in light of LSA–Const.

14. CLECO's president testified that the proposed territorial integrity agreement would give the cooperatives the *exclusive* right to operate in a particular area. This would include areas served by a cooperative which were subsequently incorporated within the boundaries of a municipality, regardless of the prior grant by the municipality of a franchise to a private electric company. Mr. Coughlin felt that such an agreement would be considered by such municipalities as an attempt to limit their local governmental authority to grant or withhold franchise rights. He justifiably feared this would result in an unfriendly attitude on the part of municipalities toward private elec-

tric companies which would be harmful to their operations under and renewal of these franchises.

He also testified that construction of facilities by the Super Cooperative with funds from this loan would not in any way help in solving the problem of territorial integrity. Instead, he said it would guarantee even further areas of friction, in the fight against an unregulated monopoly.

THE EVIDENCE FURTHER SHOWS THAT IN EXCESS OF 99% OF THE PEOPLE OF LOUISIANA ALREADY HAVE ADEQUATE ELECTRIC POWER AVAILABLE.

15. See note 4, *supra.*

(1921) Art. 6, § 4,[16] establishes the possible illegality of competition which will result from consummation of the loan—this nevertheless now inexorably compels us, at this stage of the case, to take it beyond those relied upon by defendants. In this connection we note moreover that in Alabama Power the Court distinguished Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929) on the specific ground that in Frost the competition complained of was *unlawful*, while that complained of in Alabama Power was lawful in its entirety.

These factors amply distinguish the present case from Alabama Power, TVA, and McKay, since they show that much more is involved than mere lawful competition which will result from consummation of the loan. The allegations of conspiracy and coercion also involve substantially more than the alleged violation of a statute in approving the loan, and thus surpass the facts found in McKay.[17] We find, therefore, that plaintiff has established sufficiently that it has standing to sue.

■■ Under F.R.Civ.P. 65 a preliminary injunction may be issued after a hearing if there is a showing of irreparable injury and a showing that the injunction is warranted by the convenience of the parties and the public interest. 3 Barron and Holtzoff, Federal Practice and Procedure § 1433, at 490–491 (1958). If plaintiff is denied the injunction here applied for at this time, it is likely that during the course of the litigation which will follow the loan may be consummated, and construction may be begun on the generation and transmission facilities. That factor could result in harm to plaintiff causing irreparable injury. Moreover, it will be more convenient for both parties to have the propriety of the loan grant determined before final consummation of the loan and before construction is begun.

There likewise is a strong showing of a public interest here. If defendants are permitted to consummate the loan, plaintiff will find that several million dollars worth of its equipment and facilities will be rendered inactive. Plaintiff's president testified that it would be necessary to have a rate increase to make up for this loss. It has been shown, then, that there is likelihood that as a result of the loan in question the rates of users of electric power from private electric utilities as well as the rates of users of electric power from the cooperatives would be increased.

Counsel for defendants have contended that the Super Cooperative is not subject to regulation by the Louisiana Public Service Commission, and they contend that, since the Super Cooperative will not transmit electric power in interstate commerce, it will not be subject to regulation by the Federal Power Commission. To us this is a sort of equitable hara kiri, and we fail to follow its reasoning in light of § 904. Plaintiff contends this would result in the creation of an unregulated monopoly and would make industrial management wary of moving to Louisiana. Thus the current public policy of this state to encourage the location of industry in Louisiana would be seriously hindered. The possible damage to the industrial development of this State, and of increased rates, is of basic interest to the public.

These compelling factors show that plaintiff has made a showing entitling it to a preliminary injunction. Since it has shown that it has standing to sue and that it is entitled to a preliminary

16. Plaintiff Exhibit D was a copy of a petition filed by plaintiff before the Louisiana Public Service Commission for a rule ordering the Super Cooperative to show cause why it should be permitted to construct generating stations or transmission lines in Louisiana. To this petition the Super Cooperative filed an exception of no cause or right of action on the ground that it is exempt from the jurisdiction of the Commission. This issue thus has been raised in a state forum, but has not been decided yet.

17. See note 13, *supra*, and accompanying text.

injunction, defendants' motions to dismiss and for summary judgment are denied.

 Defendant contends that plaintiff's claim should be dismissed because it is a suit against the sovereign without its consent. The general rule is that the United States by reason of its sovereignty is immune to suit unless it has given its consent to such action.[18] A suit is against the sovereign if the judgment sought would expend itself on the public treasury or interfere with the public administration. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). But there are two well recognized exceptions to the rule of sovereign immunity which permit a suit to be brought which alleges (1) that actions by officers exceeded their statutory powers, or (2) that although the actions of the officers are within their statutory powers, their exercise in the particular case is constitutionally void. Dugan v. Rank, supra; Malone v. Bowdoin, 369 U.S. 643, 82 S. Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).[19] Here plaintiff alleges the actions of defendants in approving the loan are beyond their statutory authority and that their actions constitute an unconstitutional deprivation of their property rights. We thus find that the action is not barred by the doctrine of sovereign immunity.

 Motions for leave to intervene have been filed on behalf of Louisiana Power and Light Company and Gulf States Utilities Company under F.R.Civ. P. 24(b). These applicants' claims have questions of law and of fact in common with the principal action, and their intervention will not delay or prejudice unduly an adjudication of the rights of either plaintiff or defendants. Therefore, the motions for leave to intervene are granted.

An appropriate decree, approved as to form by counsel for defendants, should be prepared and presented by counsel for plaintiff.

---

18. United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940); Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939); United States v. Thompson, 98 U.S. 486, 25 L. Ed. 194 (1878).

19. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) in which suit was brought successfully attacking a Presidential Executive Order on the ground that it exceeded the constitutional and statutory authority of the President. There seemed to be no question of a violation of sovereign immunity in the mind of the Court or of counsel, for the issue was not even mentioned in the majority opinion.