**NORTHERN STATES POWER COMPANY, a corporation, and Otter Tail Power Company, a corporation, Plaintiffs,**

v.

**RURAL ELECTRIFICATION ADMINISTRATION, Norman M. Clapp, as Administrator of the Rural Electrification Administration, the United States Department of Agriculture, Orville L. Freeman, as Secretary of the United States Department of Agriculture, and John Doe and Mary Roe whose true and correct names are unknown to plaintiffs, Defendants.**

No. 4–65–Civ.–260.

United States District Court
D. Minnesota,
Fourth Division.

Dec. 31, 1965.

Kenneth W. Green and Joe A. Walters, Minneapolis, Minn., Cyrus A. Field, Fergus Falls, Minn., Arland D. Brusven, Minneapolis, Minn., Donald E. Nelson, Minneapolis, Minn., of counsel, for plaintiffs.

Howard E. Shapiro, Dept. of Justice, Washington, D. C., Miles W. Lord, U. S. Atty., Minneapolis, Minn., for defendants.

DEVITT, Chief Judge.

In this action by two privately owned power companies against certain government officials, several motions pend. Plaintiffs, Northern States Power Co. (N.S.P.) and Otter Tail Power Co. (O.T.P.) move for a preliminary injunction. Defendants move for dismissal or in the alternative for summary judgment. A temporary restraining order issued on September 17, 1965 is extant.

Plaintiffs in this action seek to challenge a loan approved by the R.E.A., pursuant to the Rural Electrification Act of 1936, 7 U.S.C. § 901 et seq., (R.E.Act), to the East River Electric Power Cooperative, Inc. (East River) on May 26, 1965, in the amount of $5,919,000. Plaintiffs claim the loan is illegal because consummated in violation of R.E.A. Bulletin 111–3, 29 Federal Register No. 40, pp. 2765–2766, which allegedly establishes certain rights in favor of power suppliers such as N.S.P. and O.T.P. and imposes certain duties upon the R.E.A. and the Administrator.

The loan to East River consists of two portions: $4,027,000 to finance transmission facilities in South Dakota, and $1,892,000 to finance transmission facilities in Minnesota. N.S.P. and O.T.P. now serve as wheeling agents, or transmitters, of the power which East River, a supercoop, purchases from the Bureau of Reclamation and furnishes to its two Minnesota member cooperatives, Lyon-Lincoln Electric Cooperative and Traverse Electric Cooperative, which in turn furnish electric power to consumers. With the loan East River would build its own transmission facilities in Minnesota duplicating to some extent the existing N.S.P. and O.T.P. facilities.

R.E.A. Bulletin 111–3 provides in part: *Purpose.* This notice sets forth REA policy with regard to power supply surveys and certificates thereto by the Administrator in relation to the approval of loans for generation or transmission facilities.

\*    \*    \*    \*    \*    \*

\*  \*  \* No loan for generation or transmission facilities will be made except \*  \*  \* upon certification by the Administrator to the Secretary of Agriculture that the loan has been approved after the completion of a power supply survey which shows that the loan is \*  \*  \* (c) needed because existing and proposed contracts to provide the proposed facilities or service to be financed were found to be unreasonable, each supplier involved was so advised, REA attempted to have such contracts made reasonable, and the

existing or other proposed supplier had failed or refused to do so within the time set by the Administrator. 29 Federal Register No. 40, pp. 2765–2766.

East River applied to R.E.A. for the loan on May 26, 1964. The administrator, at about such time or prior thereto, undertook a two-part power survey, one part dealing with Minnesota and one part dealing with South Dakota. The survey began after the two newly-acquired Minnesota members of the East River System began receiving transmission service from N.S.P. and O.T.P. under a 22-month contract negotiated between plaintiffs and East River.

The parties differ as to what constitutes the relevant history of the R.E.A. determination to grant the loan to East River. The plaintiffs note a conference on June 9, 1964 among representatives of N.S.P., O.T.P., R.E.A. and East River as the first material attempt by the Administrator to institute negotiations for a long-term power supply arrangement between plaintiffs and East River. On the other hand, defendants point to correspondence and meetings long prior to the June, 1964 date as being negotiations relevant to the eventual granting of the loan and rejection of plaintiffs' proposals. Plaintiffs characterize plans submitted by plaintiffs and considered by East River in June and July of 1964 as working drafts of possible arrangements to obviate the need for an R.E.A. loan while the R.E.A., the Administrator and East River apparently viewed such drafts as final proposals.

On August 3, 1964 the R.E.A. informed plaintiffs by letter of certain basic requirements which any acceptable joint plan proposal must meet. It was suggested that East River would build, with R.E.A. aid, certain facilities which N.S.P. and O.T.P. would use in exchange for the use by East River of certain presently existing facilities of the plaintiffs. Straight-wheeling arrangments, under which plaintiffs would transmit power to East River's Minnesota members for a charge rather than in exchange

for the use of East River facilities, were also considered. The R.E.A. eventually concluded that plaintiffs' proposals were unreasonable and so informed them.

During September 21–24, 1964, further negotiations took place in the R.E.A. offices in Washington, D. C., with representatives of all parties in attendance. Following this meeting N.S.P. and O.T.P. submitted another proposal on October 2, 1964. Plaintiffs characterize this proposal as "definite" while defendants characterize it as "final."

Further negotiations concerning the approval or disapproval of plaintiffs' last proposal ceased until May 17, 1965 when the R.E.A. informed N.S.P. and O.T.P. that the plan was unreasonable and unsatisfactory. On May 26, 1965 the Administrator approved the loan to East River.

Beyond this skeleton view of the negotiations prior to the granting of the loan, substantial dispute exists among the parties as to the significance of various meetings and correspondence, the nature of various proposals, the effect of various dates and deadlines, and the meaning and intent of various communications among the parties. In addition defendants allege dilatory and insufficient action on the part of plaintiffs in the submission of proposals while plaintiffs allege dilatory and insufficient action by defendants in considering proposals and otherwise acting in conformity with the requirements of Bulletin 111–3.

Plaintiffs' basis for this motion for a preliminary injunction, as well as for the relief requested in the main action, is the alleged failure of the R.E.A. to follow the procedural steps contained in Bulletin 111–3. Specifically, plaintiffs allege a fulfillment in the plaintiffs' proposal of October 2, 1964 of the R.E.A.'s basic requirements set forth in the letter of August 3, 1964. Further, plaintiffs allege the failure of the R.E.A. between October 2, 1964 and May 17, 1965, the date of the Administrator's rejection of plaintiffs' last proposal, to inform plaintiffs wherein the proposal was unreasonable or to make any attempt

to have the proposal made reasonable. Also plaintiffs allege that the letter of May 17, 1965 rejecting the proposal does not sufficiently inform plaintiffs of the unreasonableness of the proposal and no opportunity has since been given to attempt to make the proposal reasonable. Plaintiffs contend the R.E.A. has acted in violation of Bulletin 111-3, which plaintiffs claim is a duly promulgated administrative regulation having the force and effect of law and binding on the R.E.A. and the Administrator. Further, such actions are alleged to be arbitrary and capricious in violation of the rights of plaintiffs.

Plaintiffs assert several grounds for jurisdiction and venue; 28 U.S.C.A. § 1361, granting district courts original jurisdiction in actions in nature of mandamus; 5 U.S.C.A. § 1009, § 10(a) of the Administrative Procedure Act, granting judicial review of administrative action in certain situations; 28 U.S.C.A. § 2201, dealing with declaratory judgments; 28 U.S.C.A. § 1331, granting original jurisdiction to district courts when the matter in controversy exceeds the value of $10,000 and arises under the Constitution, laws or treaties of the United States; and 28 U.S.C.A. § 1391, concerning venue in cases where each defendant is an employee or officer of the federal government acting in his official capacity.

Defendants, in addition to opposing the granting of a preliminary injunction, move for dismissal or for summary judgment. Defendants urge primarily the grounds that plaintiffs lack standing to sue, that the action constitutes an unconsented suit against the United States, and that the subject matter of the R.E.Act has been committed to the unreviewable discretion of the Administrator and is, therefore, not judicially reviewable. These three negative contentions viewed affirmatively constitute the single issue of whether plaintiffs have any judicially enforceable and reviewable legal right in this situation.

Defendants rely on a line of cases denying standing to similar plaintiffs on the ground that mere economic competition, which is in itself lawful, created as the result of government action, grants no standing to persons in circumstances similar to the plaintiffs in this action. Defendants further assert in this regard that R.E.A. Bulletin 111-3 is merely a notice or a policy statement and not a duly promulgated regulation having the force and effect of law and, therefore, establishes no legal rights in favor of persons such as the plaintiffs here.

In support of their motion for summary judgment defendants allege, beyond the above contentions as to standing, that no genuine issue of material fact remains for determination at trial and they are, therefore, entitled to judgment as a matter of law. Defendants thus maintain that on the undisputed facts of this case the procedure of the R.E.A. was lawful in all respects and fully in compliance with the procedure outlined in Bulletin 111-3. In this connection defendants recite an abundant list of correspondence, meetings and other communications, studies and events which they urge establish the facts of the requisite power study, consideration of plaintiffs' proposals, findings of unreasonableness, advisement of and attempts to correct such unreasonableness, the establishment of a final cut-off date for negotiations, consideration of plaintiffs' final proposal, and an eventual final finding of plaintiffs' proposal being unreasonable. Such procedures prior to the granting of the loan constitute the basis of defendants' allegations of compliance with Bulletin 111-3 and otherwise lawful action entitling them to summary judgment.

Defendants' major contention urged at the hearing on these motions is plaintiffs' lack of standing to test judicially the R.E.A.'s action. In the resolution of this issue, particularly, the precise basis of plaintiffs' cause of action is significant. Plaintiffs assert no right to challenge the authority of the R.E.A. to grant loans or for that matter to grant the loan in question here; neither do plaintiffs claim that the competition of

the R.E.A. financed facilities grants standing to challenge the loan. Rather plaintiffs claim R.E.A. Bulletin 111–3 is a duly promulgated regulation having the force and effect of law and binding upon the R.E.A. and the Administrator, and that a loan approved without adherence to it invades the plaintiffs' rights and entitles them to judicial review of the agency action.

Defendants rely primarily on the case of Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955), and other cases of similar import both before and after the Kansas City case. In that case the plaintiff sought to challenge a loan granted by the R.E.A. Citing Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), the court in the Kansas City case held the sole interest of the plaintiff in eliminating legal economic competition grants no standing to sue. The plaintiff in the Kansas City case claimed nothing in the way of having to abandon activities or forego any planned expansion or any illegalities by the R.E.A. or other interested parties.

The court further stated that the R.E. Act and the Flood Control Act contain no provision for judicial review of agency action, as some other statutes do, but only provided for congressional review and control through the power of annual appropriations. Likewise, the court found plaintiff had no standing under the more general purview of § 10(a) of the Administrative Procedure Act since plaintiff suffered no "legal wrong" nor was adversely affected or aggrieved by any agency action within the meaning of any relevant statute.

The Alabama Power Co. case, supra, also similar to the present case, makes the analogy between agency action giving rise to economic competition and private action resulting in competition. For example, if a corporation made an ultra vires loan to a power supplier effecting competition with an existing power supplier, the latter person would have no standing to challenge the legality of the loan merely because it suffered economic competition when such competition was in itself legal.

Other cases of similar import are Tennessee Elec. Power Co. v. T. V. A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1938), and Duke Power Co. v. Greenwood, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381 (1938); and more recently, Alabama Power Co. v. Alabama Elec. Cooperative, 249 F.Supp. 855 (Mid.D. Ala.N.D.1965).

Instances of a lack of standing for judicial review of agency action when the sole injury of economic competition is alleged are not unusual and certainly not limited to R.E.A. activities nor factual settings such as arose in the above cited cases or the present action. For example, in Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 330 F.2d 217 (1964), the plaintiff complained that the government was illegally allowing alien commuters into this country to work, presumably impinging on the work supply available to plaintiff's members. The court stated that Congress had given no standing to the plaintiff either expressed or implied in any statute, and, therefore, plaintiff had none when the only complaint or injury was mere economic competition made possible by government action, even if such action be illegal. In Pennsylvania R. Co. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292 (1964), the court followed the same reasoning in determining that shippers have no legally protected right to be free of competition, in the absence of statutory aid, and hence no standing on the basis of mere economic competition, to challenge the documentation by the Commissioner of Customs of certain vessels, even if such documentation was illegal. Likewise in Berry v. Housing and Home Financing Agency, 340 F.2d 929 (2nd Cir. 1965), and Taft Hotel Ass'n v. HHFA, 262 F.2d 307 (2nd Cir. 1958), plaintiffs were denied standing on the basis of economic loss stemming from lawful competition made possible through federal aid.

The insistence of the courts in denying standing based upon legal economic com-

petition established by government action, while firm within certain limits, by no means precludes standing when some legal wrong is present. The most recent and most similar example is the case of Central Louisiana Elec. Co. v. R. E. A., 236 F.Supp. 271 (W.D.La.1964) (now on appeal). The situation in this case closely paralleled the facts of the instant case. The court there agrees with the Kansas City, Alabama Power and Tennessee Power cases, supra, that the plaintiff power supplier would have no standing if the only basis of complaint was economic injury due to the establishment of lawful competition. However, the court found more in this case, evidence of a conspiracy between the R.E.A., the supercooperative and the member cooperatives to obliterate the business of the plaintiff. Such a situation gave standing to the plaintiff and a preliminary injunction issued. Similarly the case of Kentucky Utilities Co. v. T. V. A., 237 F.Supp. 512 (E.D.Tenn.1964), granted standing to challenge agency action because the finding of a conspiracy caused the competition itself to be illegal. The dissent of Judge Prettyman in the Kansas City case, supra, is to a like effect. Cf., Justice Butler, dissenting in the Tennessee Elec. Power Co. case, supra, stating a constitutional ground for standing in the event agency action invaded property rights or destroyed property, whether or not authorized by statute, if possible violations of due process were involved.

Analogous decisions in other areas of administrative action have allowed standing when an injury was beyond mere lawful economic competition. In Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), plaintiff had standing to challenge the charter of a competitor bank in a location prohibited by statute and, therefore, evidencing an unlawful act by the government giving rise to unlawful competition. In Gonzalez v. Freeman, 118 U.S. App.D.C. 180, 334 F.2d 570 (1964), involving the disbarment of a contractor from participation in government contracts, the court granted standing on the claim of arbitrary or unfair government action either substantively or procedurally, although the court stated that plaintiff had no legal right to be granted government contracts.

■ By way of summary, therefore, the law denies standing to plaintiffs such as N.S.P. and O.T.P. if the only injury complained of lies in the economic loss caused by the competition, lawful in itself. On the other hand, if plaintiffs' claim is of unlawful competition or the invasion of some legal right, standing exists for a judicial determination of whether plaintiffs have suffered a legal wrong.

As stated earlier, plaintiffs' complaint does not deal with the authority of the R.E.A. to ultimately grant a loan establishing competition with N.S.P. and O.T.P., nor any right to be free of competition from East River and other cooperatives. Rather plaintiffs seek judicial protection of rights allegedly established in their favor in R.E.A. Bulletin 111–3. In this posture, then, plaintiffs' right to judicial review rests on the legal stature of the Bulletin.

■■ R.E.A. Bulletin 111–3 appears in 29 Federal Register No. 40, pp. 2765–66. No indication appears in the Bulletin itself, or anywhere else, that it was meant to be anything but a statement of R.E.A. rules of general applicability and legal effect and published in accordance with the Federal Register Act, 44 U.S.C. § 301 et seq. Such rules so promulgated have the force and effect of statute or law and are binding on those persons publishing them as well as on the general public, until such time as they be repealed or modified. Sheridan-Wyoming Coal Co. v. King, 84 U.S.App.D.C. 288, 172 F.2d 282 (1949), reversed on other grounds, sub nom, Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393 (1950) (deals with regulations of the Secretary of the Interior); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (deals

with regulations of the Attorney General) ; United States ex rel. Ohm v. Perkins, 79 F.2d 533 (2nd Cir. 1935) (deals with rules of the Department of Labor). This binding force and effect of statute or law attaches to duly promulgated regulations whether or not the person or body publishing them was under any obligation to impose the duties or restrictions upon himself or others. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

But defendants contend that Bulletin 111–3 is merely a statement or notice of policy made at the request of a congressional committee and meant primarily to communicate internal procedures to that committee and not to carry any general applicability and legal effect such as would impose duties upon the R.E.A. or the Administrator or establish legal rights in favor of power suppliers such as N.S.P. and O.T.P. The case of Central Louisiana Elec. Co. v. R. E. A., supra, affords some support for this view. The district court in Louisiana there stated, in dictum and without discussion of the point, that Bulletin 111–3 does not have the force and effect of law but merely delineates R.E.A. policy in this area.

In spite of this judicial observation and defendants' contentions, several considerations indicate the propriety of a contrary conclusion. Whatever may have been the intent of those publishing the Bulletin, it would appear to constitute a duly promulgated regulation enacted within the legal authority of the R.E.A. resulting in a pronouncement having the force and effect of law.

A reading of the Federal Register Act itself, 44 U.S.C. § 301 et seq., lends support to this conclusion. Section 304 defines "document" to be published in the Federal Register as including any "order, regulation, rule * * * " issued by a Federal Agency and Section 305 prohibits the publication in the Federal Register of "comments or news items of any character."

The policy reasons why administrative agencies, or any other authority, must maintain adherence to known procedures and rules are well known and long established, and strongly support the plaintiffs' suggested construction of Bulletin 111–3. The public has a right to know what treatment to expect both substantively and procedurally from its government and should not be subject to the shifting whims of a government administrator. Germania Iron Co. v. James, 89 F. 811 (8th Cir. 1898).

With this policy and the above quoted language of the Federal Register Act in mind, it is logical to view R.E.A. Bulletin 111–3 as a duly promulgated regulation having binding effect. Publication in the Federal Register naturally implies to plaintiffs and the public in general something more than a mere statement of internal agency affairs not affecting the public. If the burden is on anyone to communicate clearly some other intent in the publication of a statement in the Federal Register, it must be with those making the publication. Plaintiffs were entitled to rely on Bulletin 111–3 as being a regulation having the force and effect of statute or law, and to consider adherence thereto by the R.E.A. as a legal right in their favor.

The statements of the committee requesting the issuance of Bulletin 111–3 further identifies its stature as a binding regulation imposing duties upon the R.E.A. and the Administrator. Senator Holland of the Senate Committee on Appropriation submitted a report in the 89th Congress, 1st Session, to accompany H.R.8370, which made appropriations for the Department of Agriculture and related agencies for the fiscal year ending June 30, 1966. This report refers to Report No. 497, 88th Congress, 1st Session, made by this committee in conjunction with the house committee. In the words of Senator Holland the committee at that time

imposed certain *duties* and responsibilities upon the REA Administrator to its borrowers and their *power suppliers* to be complied with before approving loans for generation and transmission facilities.

The committee directs the REA Administrator's attention to this action and the *regulations* promulgated thereunder. * * * [Emphasis added.]

R.E.A. Bulletin 111–3 followed and was apparently prompted by the committee's action. The quoted passages reveal explicitly and unequivocally the committee's understanding of the nature and effect of Bulletin 111–3. The clear import is that duly promulgated regulations were to issue from the R.E.A. with the character accorded them by law, namely the full, binding force and effect of statute.

The argument of the R.E.A. Administrator (and the other defendants) that Bulletin 111–3 was a mere policy declaration and no more than that, is fatuous. The practical realities of the situation appear to be that the Administrator wanted to satisfy the wishes of the powerful Appropriation Committees of the Congress in order to insure a favorable recommendation from them for funds, but at the same time apparently did not want to tie his own hands as to the expenditure of those funds—and hence his urging here that Bulletin 111–3 is "simply an announcement of certain procedures in connection with loans." But the Administrator is inconsistent. There is no legal support for his having a special "understanding" with a Congressional Committee with reference to public funds which is not binding on him and the public. He wants to run with the hares and hold with the hounds. He secured the funds on representations made to the Congress in apparent good faith and sanctified them by the promulgation of a regulation in the Federal Register. It was relied upon by the public. Now he, like everyone else, must follow his own regulation.

■ And so, judicial review is available to plaintiffs on the allegation that the R.E.A. has not complied with the procedures contained in Bulletin 111–3 in the granting of the loan to East River. Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 1009, provides for this review for persons suffering legal wrong because of agency action.

■ Section 10(a) is not new law and in fact incorporates the law of such cases as the Alabama Power case, supra. The Administrative Procedure Act merely clarifies the already existing right to judicial review if administrative action invades a person's legal right, as opposed to an interest of the public generally. Duba v. Schuetzle, 303 F.2d 570 (8th Cir. 1962). The conclusion that Bulletin 111–3 has the force and effect of statute clearly brings these plaintiffs within the purview of § 10(a) as persons suffering a legal wrong on account of defendants' action or adversely affected or aggrieved by such action within the meaning of any relevant statute. Even the Kansas City case, supra, which defendants rely on so heavily recognizes appropriate judicial review of agency action if such action has disregarded some legal right, even beyond the strict scope of § 10(a) of the Administrative Procedure Act, i. e., "within the meaning of any relevant statute."

■■ Plaintiffs' right to judicial review is not precluded here, as is possible in some instances, by either a statute specifically precluding judicial review of agency action or the activities in question being committed to the sole discretion of the R.E.A. and the Administrator. See Gonzalez v. Freeman, supra. Jurisdiction under § 10(a) need not be specifically provided for in a statute but only must be not specifically precluded. Judicial review is neither expressly nor impliedly prohibited in the R.E.Act. The only provisions of the R.E.Act tending to rest sole discretion in the Administrator or sole review in Congress rather than in the courts are 7 U.S.C. §§ 908, 909, 910, dealing with peripheral matters such as the discharge of personnel, prohibitions on partisan based action, and the submission of an annual report to Congress. None of these matters bear on the issues of this case and no other provision of the R.E.Act expressly or impliedly commits matters to the unreviewable discretion of the Administrator.

Defendants also seek dismissal by characterizing this action as an unconsented suit against a sovereign. In addition to the preceding discussion establishing plaintiffs' right to judicial review, one further observation is pertinent in connection with this allegation. A clearly established exception to the normal rule of sovereign immunity is the allegation that actions by officials exceeded statutory powers. The limiting statutory effect of Bulletin 111–3 and plaintiffs' claims of disregard by the R.E.A. and the Administrator of such limitations clearly brings this case within the exception to the normal sovereign immunity rule, if it is applicable in any event to this case. See Central Louisiana Elec. Co. v. R.E.A., supra, at 280, and the authorities cited therein.

Defendants also move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The grant of such a motion rests, of course, on the question of whether or not any genuine issue of material fact remains for determination at trial. Much of the objective evidence in this case is indisputable, i. e., the dates and contents of numerous letters and other communications, reports, proposals, events, etc. On the other hand, numerous genuine issues of fact remain in such areas as the intent and understanding of the parties as to the stage of negotiations and the significance of various dates, events, proposals, etc. These are necessary and material facts bearing on such questions as the reasonableness of the actions and decisions involved in this case and must await determination at trial. Summary judgment is not an appropriate remedy in this action.

Plaintiffs have moved for a preliminary injunction. Even assuming that upon a final resolution of this case plaintiffs would be entitled to injunctive relief, the factors necessary to the granting of preliminary relief now have not been shown. There has been no showing by the plaintiffs of a reasonable certainty of success at trial or of irreparable injury if the preliminary injunction is denied. Generally the court in the exercise of its discretion in this area must balance the convenience of the parties and the possible injuries which may follow the granting or withholding of injunctive relief. 3 Barron & Holtzoff, Federal Practice and Procedure § 1433 at 490–495 (Wright ed. 1958).

In contrast to plaintiffs' allegations concerning disregard of the procedural requirements of Bulletin 111–3, considerable evidence indicates that defendants have indeed proceeded in accordance with the regulations. At this stage of the proceedings plaintiffs have not established the requisite reasonable certainty or substantial likelihood of success on the merits so as to justify preliminary injunctive relief.

Although a preliminary injunction would maintain the status quo, no showing of irreparable harm is manifest. Plaintiffs will not be deprived of their property before a determination on the merits. In the event they ultimately succeed in the action it is doubtful that irreparable harm will have befallen them in the interim. Further, while the public interest in preventing waste or misuse of public funds is an important consideration, such interest is overbalanced, in the absence of the reasonable certainty of success by plaintiffs on the merits, by the need for public agencies such as the R.E.A. to carry out their functions.

Defendants' motions for dismissal or for summary judgment, and plaintiffs' motion for preliminary injunction are denied. The temporary restraining order of September 17, 1965 is vacated.