Breitel, J. (dissenting).
This is an unusual action, unique in the State of New York, in which a gas utility, as a purported competitor of an electric utility, seeks a declaratory judgment and injunction against the electric utility on the ground that the latter is violating the Public Service Law, and the State antitrust law (Donnelly Act, General Business Law, § 340). It is alleged that the electric utility is charging discriminatory lower rates for lighting in order to tie-in electric power for space heating to favored consumers, thus harming the gas utility which merchants gas for space heating. A crude, but not too remote analogy, would be an action by a steel corporation against an aluminum company on the ground that the aluminum company is practicing price discrimination and tie-in sales in promoting aluminum as a substitute building material for steel in the construction of buildings. A difference here, however, is that a public utility is alined on each side of the litigation, each subject to close statutory and administrative regulation by the Public Service Commission.
Before reaching the consequences which flow from the public utility status of the litigants there is an unusual issue of standing.* All of the New York cases relied upon by plaintiff to show *130 standing involved, as defendant argues, encroachment on a franchise, and, thus, the invasion of a property interest (e.g., De Matteis v. McGoldrick Realty Co., 259 N. Y. 452; Brooklyn City R. R. Co. v. Whalen, 191 App. Div. 737, affd. 229 K Y. 570; Surface Transp. Corp. v. Reservoir Bus Lines, 271 App. Div. 556; International Ry. Co. v. Barone, 246 App. Div. 450; Kingsbridge Ry. Co. v. City of New York, 204 App. Div. 369). In most of these cases there was an invasion by another transportation company of a transportation route granted by exclusive franchise, sometimes but not always involving the same kind of vehicle. Under traditional rules, the plaintiff had a right to protect its property interest in the franchise, and, of course, there was no claim of antitrust law violation.
Actually, there have been few cases, and none in this State, in which a competitor has sued or defended against another in private litigation based on a public service law or an antitrust law violation which did not involve a transaction between them. The few cases that have arisen elsewhere did not result in judgment in favor of the plaintiff (e.g., Tennessee Power Co. v. T. V. A., 306 U. S. 118). By happenstance, while this action was pending, the Supreme Court reversed the lower Federal courts and propounded a new test of standing in Data Processing Serv. v. Camp (397 U. S. 150). Under the broad “zone of interests ” test, which now seems to have displaced the older legal interest ’ ’ test, a competitor may have standing to protest a harmful administrative determination or to sue if an available statute has as its purpose the protection of the suitor as distinguished from the public (id., pp. 154-155). As will be seen, plaintiff hardly satisfies these tests. But there is no doubt that the new Federal rule, which does not necessarily determine the State rules on standing, might broaden the horizon for standing in State cases and it may be that the horizon extends even further. That being so, it may be better for the purposes of this action to assume that plaintiff does have standing, extremely doubtful though it be.
A more serious problem in this case is whether tie-in sales, assuming that defendant is guilty of such practices, are covered by the Donnelly Act. This depends upon whether the Donnelly Act language, almost identical with that of the Sherman Antitrust Law, suffices to condemn tie-in sales (U. S. Code, tit. 15, *131 § 1). While the Clayton Act is more specific in its condemnation of “ tying ” arrangements, Federal courts have held that tie-in sales may also constitute a violation of the more general language of the Sherman Act (U. S. Code, tit. 15, § 14; Northern Pac. Ry. Co. v. United States, 356 U. S. 1, 5-6; Times-Picayune v. United States, 345 U. S. 594, 605). Be that as it may, it does not necessarily follow that New York courts will or should give their similar statute the same interpretation. They have not before this, and there is no compulsion, logical or otherwise, that they do so. But again, in order to reach the merits which should be more decisive, it is assumed that tie-in sales are covered by the Donnelly Act. It is also accepted that whether defendant can justify the differential rates it charges to municipalities that use electricity for space heating on the economy of unit-size ’ ’ transactions, that is, the economy resulting from the sale of larger rather than smaller quantities to the same consumer, is at least a question of fact.
One may also agree that plaintiff’s failure to give notice of this action to the Attorney-General is not, or at least should not, be fatal to the complaint (General Business Law, § 340, subd. 5). The failure to give such notice, however, and the requirement that such notice be given points up the possible confusion between the private ’ ’ and ‘ ‘ public ’ ’ character of this litigation. Moreover, it is most unfortunate that in this very case the views of the Attorney-General have not been brought before the court to give a “ public ”, including the Public Service Commission’s, point of view on the issues.
The reef upon which this litigation should founder is the scope and content of regulation of gas and electric utilities under the Public Service Law.
Section 65 of the Public Service Law provides for the standards and rates of service to be furnished by gas and electric utilities and, notably, also by municipal corporations. As to standards and rates, they must conform with law or be authorized by the Public Service Commission. The section (consisting of six relevant subdivisions, in three expressly, in three impliedly) imposes regulation dependent upon the action of the Public Service Commission in fixing rates and standards of service. It is in this context that prohibitions on rates and other unfair discriminations are found. No part of the section makes *132 sense except when read against the power of the commission to vary the rates and practices, e.g. in allowing a “ sliding scale ” of rates as provided in subdivision 4, or to use “unit-size” differentials as permitted by subdivision 5.
It is section 66 of the same law governing the powers of the commission which provides the exemption under which defendant contends it is entitled to make the agreements it has made with municipalities, without running afoul of the Public Service Law or the antitrust law. Subdivision 12 exempts from its provisions “ contracts ” by gas and electric utilities with the State, the Federal Government, or municipalities. The subdivision, it is true, deals with the filing and approval of rates and standards of service. But that is how section 65 is designedly implemented. Hence, the exemption evidences a complete one of governmental contracts from commission control and, therefore, from regulation by the statute as well. The statutory scheme is obvious and traditional for almost a century in giving all utility regulatory power to the administrative agency. For reasons readily apparent none would wish to leave an area of public utility regulation to the courts and the clumsiness of private litigation in common-law form.
In the analogous situation affecting water companies under substantially similar statutes this court made clear the exempted status of contracts with municipalities. Thus, in City of New York v. Maltbie (274 N. Y. 90), it. was said: “ That section has to do with the filing of schedules and contracts by water works corporations and the exception simply provides that the provisions of the section shall not apply to state, municipal or federal contracts. ’ The section has nothing to do with the general jurisdiction granted to the Public Service Commission to fix rates only as it constitutes a limitation of that power. At the time the order was made by the Public Service Commission, the city did not have a contract with the water company for furnishing hydrant service. The limitation contained in section 89-e, subdivision 10, ‘ but this subdivision shall not apply to state, municipal or federal contracts,’ has no application under the facts here involved. A different question would be presented if at the time the order of the Public Service Commission was made, a contract had been in existence between the city and the water company and the Commission had attempted by order to abro *133 gate and nullify such contract. When there is in existence a contract between a municipality and a water works company for water for a public use, the Public Service Commission is without authority to fix a rate therefor. If, however, there is no contract in force, the Commission upon written complaint as provided for in section 89-i shall conduct an investigation and fix a rate. The broad public policy involved in vesting in the Public Service Commission authority to fix the rates of public service corporations does not apply to the fixing of a rate when there is in existence a contract entered into between a municipal corporation and a water works company. ” (id., at p. 99). (To the same effect, see Jamaica Water Supply Co. v. City of New York, 279 N. Y. 342, 347-349.)
Nor is this interpretation of the statutory scheme novel. As early as 1920, the Public Service Commission recognized the exempted status of state, municipal, and federal contracts ’ ’, and refused to narrow the exemption to filing requirements. In Complaint against Elmira Water, Light & R. R. Co. (23 State Dept. Rep. 398) the commission was presented with an attempted abrogation by the utility of a contract by it with a municipality for street lighting by a subsequent filing of a tariff schedule. It was said of the filing exemption in the commission opinion: A narrow construction of this limitation is urged by this respondent, to the effect that this merely does away with the necessity of filing State, municipal or Federal contracts with this Commission. This narrow interpretation of the restriction, however, would render it practically meaningless. The object of the enactment was evidently to except from the machinery in reference to fixing rates, and our consequent jurisdiction, all contracts made by State, municipal, or Federal authorities with electric lighting companies.” (id., at p. 400).
The reason for distinguishing contracts with governments is not dependent merely upon statutory differences; a different policy is involved (cf. 1 Pond, Public Utilities [4th ed.], § 195, entitled, Contracts with municipal and private parties distinguished”). As defendant argues, discrimination in favor of governments acting on behalf of the public does not involve discrimination among members of the public. This was noted and commented upon at length in New York Tel. Co. v. Siegel-Cooper Co. (202 N. Y. 502) in justifying, on a variety of grounds, the *134 granting of favorable telephone rates to the City of New York. (Cf. People ex rel. Village of South Glens Falls v. Public Serv. Comm., 225 N. Y. 216, 221-225.) Interestingly, the Siegel-Cooper case commented at some length on all sorts of preferences granted to charities, clergymen, and others, as not violative of any scheme for fair and equal rates among other members of the public. It reasoned that if such preferences were permissible, so were they for cities. (See 1 Pond, op. cit., supra, § 289; Nichols, Public Utility Service and Discrimination, Managerial Problems, Regulations and Practices [1928], pp. 913-914, 935 et seq. [pointing out, however, possibilities of unfairness to general taxpayers].)
As for the different statutory treatment between filed rates charged to municipalities and rates fixed by contract, the reason again is simple. Filed rates are unilaterally imposed by the utility and, therefore, commission approval is indicated to avoid uncontrolled abuse. On the other hand, rates fixed by contract with a government, presumably a relatively strong bargainer, are perforce fixed bilaterally.
That the effect of this view would entail loss through competition to plaintiff is legally immaterial, since it would be a competitive loss sustained by plaintiff as a result of what, under existing statutes, is a lawful activity by defendant. It should be pointed out, however, that only a limited competition and, therefore, a limited loss is the possible lot of plaintiff. Only contracts, in this case made with municipalities for municipal lighting and heating purposes, would be exempted from the practices condemned by section 65 and the Donnelly Act. The matter may be stated another way: Contracts with municipalities are exempted from section 66 and, therefore, section 65; and because discrimination in favor of the municipalities is not harmful to the public (whatever the effect on the gas competitor) such discrimination is not unreasonable at common law or under the Donnelly Act.
What should not be confused with the issues in .the present case is the earlier effort of defendant by filed rates, rejected by the commission, to provide jointly lower rates for all users of electricity for space heating and lighting. That rejected schedule was not limited to municipalities and, hence, could not come under the section 66 exemption, even apart from the fact that the offending rates were not fixed by contract.
*135 On a broad view, the practical results of these conclusions are not horrendous or surprising. It is one thing for a competitor to have standing or a protectible legal interest because it is harmed by activity harmful to the public. It is quite another for it to have standing, or a legally protected interest, where it is harmed alone; the public is not, and the Legislature has not seen fit to accord it a right and a remedy in an area where at the common law and under the statutes the activity is lawful even if it harms competitors unless the public too is harmed.
Throughout most of this century there has been a dramatic struggle in and out of the Legislature to bring cheap power to the people of the State. Much of that struggle was through the development of municipal power plants and municipal distribution systems. It is in this historical context that one may better understand the exemption of municipalities from the regulation of rates fixed by them in contracts with private utilities. (See, generally, VI N. Y. State Const. Conv. Comm. 1938, ch. XXIV, Regulation of Public Utilities and Public Ownership, pp. 340-439, esp. pp. 362-366, with respect to regulation of rates charged by municipal utilities.) Until now, evidently, there has been no fear of abuse by or through municipalities in the purchase of power by contract. Should such abuse arise, it will be easy enough for the statute to be changed.
Moreover, if plaintiff were correct in its contentions there would be a potential paradox. Section 66 also exempts contracts with the State and the Federal Government. If the State were to make the same contract as defendant is making or proposing to make with a few municipalities, it is difficult to believe that plaintiff would have a good cause of action under either branch of its complaint. And, while only passing reference is made by defendant to a defect of parties, it is equally difficult to believe that the State would not be an indispensable party, as should be the municipality which may have its contract or prospective contracts indirectly struck down in this action, if plaintiff were to prevail.
The short of the matter is that utilities are rarely if ever subject to antitrust laws. Utilities by their nature are monopolies, intended so to be for reasons of efficiency and economy, but subject to governmental regulation. An enterprise other than a utility is not permitted to be a monopoly with some exceptions *136 (e.g., patentable inventions and copyrightable publications). It is to such enterprises, forbidden to be monopolies to which antitrust laws apply—obviously; the statement is circular because definitional. The point of all this is that antitrust laws forbid monopolies while public utility law allows them, subject to regulation. In their nature there is or should be generally a mutual exclusion. When, and it may even be often, it is desirable to prohibit excessive monopolistic practices by utilities affecting others, the agency for regulation is the Public Service Commission operating within its statutorily defined regulatory powers. Put another way, the traditional mode of control of lawful monopolies is by administrative regulation, not by private litigation and not through the misapplication of antitrust laws designed to promote and preserve competition.
Accordingly, I dissent and vote to reverse and dismiss both causes of action.
Judges Burke, Scileppi and Gibson concur with Chief Judge Fuld; Judge Breitel dissents and votes to reverse in a separate opinion in which Judges Bergan and Jasen concur.
Order affirmed, etc.

 An interesting variation on this action, also involving a question of standing, would be one by fuel oil distributors to enjoin defendant from engaging in its “unlawful” practices on the ground that they are harmed as competitors in providing supplies for space heating.